UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KALSHIEX LLC, | Case No.: 25-cv-2152 |
| Plaintiff, | **COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF** |
| vs. | |
| MARY JO FLAHERTY, in her official capacity as Interim Director of the New Jersey Division of Gaming Enforcement; NEW JERSEY DIVISION OF GAMING ENFORCEMENT; JAMES T. PLOUSIS, in his official capacity as Chairman of the New Jersey Casino Control Commission; ALISA COOPER, in her official capacity as Vice Chair of the New Jersey Casino Control Commission; JOYCE MOLLINEAUX, in her official capacity as Commissioner of the New Jersey Casino Control Commission; NEW JERSEY CASINO CONTROL COMMISSION; and MATTHEW J. PLATKIN, in his official capacity as Attorney General of New Jersey, | |
| Defendants. | |

## <u>INTRODUCTION</u>

1.    This action challenges the state of New Jersey's intrusion into the federal government's "exclusive" authority to regulate futures derivatives trading on exchanges overseen by the Commodity Futures Trading Commission ("CFTC").  7 U.S.C. § 2(a)(1)(A).  The New Jersey Division of Gaming Enforcement is seeking to prevent Plaintiff KalshiEX LLC ("Kalshi") from offering certain event contracts for trading on its federally regulated exchange.  New Jersey's attempt to regulate Kalshi intrudes upon the federal regulatory framework that Congress established for regulating futures derivatives on designated exchanges.  New Jersey law is both

field-preempted and conflict-preempted.  This Court should therefore issue both a preliminary and a permanent injunction, as well as declaratory relief to that effect.

2.    Commodity futures regulation has long been under the exclusive purview of the federal government.  In 1936, Congress passed the Commodity Exchange Act ("CEA"), which enacted a federal regulatory framework for derivatives.  In 1974, Congress established a federal agency called the CFTC to oversee it.

3.    The text, purposes, and statutory history of the CEA leave no question that Congress sought to preempt state regulation of futures derivatives on exchanges overseen by the CFTC. The text of the statute gives the CFTC "exclusive jurisdiction" over federally regulated exchanges.  7 U.S.C. § 2(a)(1)(A).  During the CEA's drafting process, Congress deleted a provision that would have granted states concurrent jurisdiction over futures derivatives.  *See* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sens. Curtis and Talmadge).  One of Congress's avowed goals in creating the CFTC was to avoid the "chaos" that would result from subjecting exchanges to a patchwork of 51 different—and potentially conflicting—state laws. *Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry,* 93d Cong., 2d Sess. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark).  And the statute gives the CFTC comprehensive authority over regulated exchanges, including the authority to approve or reject event contracts as against the public interest.

4.    For that reason, courts have easily found state laws preempted in similar contexts. *See, e.g.*, *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995).  The CFTC itself agrees.  It informed the U.S. Court of Appeals for the D.C. Circuit just a few months ago that, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a [designated contract market]" like Kalshi.  CFTC Brief at *27, *KalshiEx LLC v. CFTC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) (emphasis added).

5.    Two New Jersey agencies—the New Jersey Division of Gaming Enforcement and the New Jersey Casino Control Commission—are threatening to intrude on the comprehensive federal scheme for regulating designated exchanges.  Kalshi is a federally-designated and approved derivatives exchange, subject to the CFTC's exclusive jurisdiction.  It offers consumers the chance to invest in many types of event contracts, including, as relevant here, sports-outcome contracts.  These contracts are subject to extensive oversight by the CFTC, and—critically—they are *lawful* under federal law.  Two months ago, the CFTC allowed Kalshi's sports-outcome contracts to take effect without review.

6.    Even though Kalshi's contracts are lawful under the federal law that exclusively governs them, Defendants are threatening to shut down these contracts in New Jersey *immediately*.  Defendants' actions would subject Kalshi to the patchwork of state regulation that Congress created the CFTC to prevent and would interfere with the CFTC's exclusive authority to regulate futures derivatives contracts in the exchanges it oversees.  For that reason, Defendants' actions are preempted under the Supremacy Clause of the U.S. Constitution—both because Congress has occupied the entire field of regulating futures derivatives on CFTC-approved exchanges, and because Defendants' acts would squarely conflict with federal policy.

7.    Kalshi is entitled to declaratory and injunctive relief to prevent New Jersey authorities from enforcing their preempted state laws against Kalshi.

8.    The New Jersey authorities' actions threaten immediate and irreparable harm, not just to Kalshi but to its customers.  Shutting down its event contracts in New Jersey would threaten Kalshi's viability and require devising complex technological solutions whose feasibility is entirely untested and unclear.  Defendants' acts would also impair Kalshi's existing contracts with consumers, subject Kalshi's users to uncertainty and loss, and undermine confidence in the integrity of Kalshi's platform.  For that reason, concurrently with the filing of this complaint, Kalshi seeks an emergency temporary restraining order and preliminary injunction to avoid immediate and irreparable harm that would result from Defendants' unlawful acts.

## JURISDICTION AND VENUE

9.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the United States Constitution.  The federal question presented is whether New Jersey gambling laws are preempted by the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*, as applied to Kalshi's event contracts.

10.  The Eleventh Amendment imposes no bar to this Court's jurisdiction in this suit for prospective declaratory and injunctive relief against state officials.  The Eleventh Amendment does not bar "suits against individual state officers for prospective injunctive and declaratory relief to end an ongoing violation of federal law."  *Pennsylvania Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 323 (3d Cir. 2002).

11.  Venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2). The Individual Defendants perform their duties and thus reside in this District.  The New Jersey Division of Gaming Enforcement and New Jersey Casino Control Commission are entities subject to this Court's personal jurisdiction and thus reside in this District.  A substantial part of the events giving rise to the claim occurred in this District.

## PARTIES

12.  Plaintiff Kalshi is a financial services company with its principal place of business in New York.  Kalshi operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts.  Its exchange market is federally regulated by the Commodity Futures Trading Commission pursuant to the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*

13.  Defendant Mary Jo Flaherty is sued in her official capacity as the Interim Director of the New Jersey Division of Gaming Enforcement.

14.  Defendant New Jersey Division of Gaming Enforcement is sued as the independent state agency within the Attorney General's office that, among other things, (1) promulgates rules and regulations for the licensing and operation of gaming in the state of New Jersey, (2) enforces

state laws and regulations governing gaming in the state, and (3) monitors day-to-day casino operations to ensure regulatory compliance and investigate potential violations.

15.  James T. Plousis is sued in his official capacity as Chairman of the New Jersey Casino Control Commission.

16.  Alisa Cooper is sued in her official capacity as Vice Chair of the New Jersey Casino Control Commission.

17.  Joyce Mollineux is sued in her official capacity as Commissioner of the New Jersey Casino Control Commission.

18.  The New Jersey Casino Control Commission is sued as the independent state agency that licenses New Jersey casinos and their key employees.  As a quasi-judicial panel, the Commission entertains hearings on contested licensing matters and appeals from decisions of the New Jersey Division of Gaming Enforcement.

19.  Defendant Matthew J. Platkin is sued in his official capacity as Attorney General of New Jersey.

## FACTUAL ALLEGATIONS

**A. An Event Contract—Like Other Derivatives—Is A Recognized Financial Tool To Mitigate Risk.**

20.  Derivatives contracts are financial tools used to mitigate risk.  Event contracts are a quintessential example of a derivatives contract—they are a type of option.  This form of derivatives contract identifies a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date.  Most commonly, event contracts involve a binary question:  Every "yes" position has an equal and opposite "no" position.  For example, a derivatives contract might center around whether an earthquake will take place in Los Angeles County before December 31, 2025.  A purchaser may trade on either the "yes" or the "no" position on the Los Angeles earthquake contract.  If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

21.  Event contracts are traded on an exchange.  Traders exchange positions with other traders in the marketplace.  Importantly, event contracts do not reflect a "bet" against the "house."

22.  The value of an event contract is determined by market forces.  An event contract's price will fluctuate between the time of its creation and the expiration date in accordance with changing market perceptions about the likelihood of the event's occurrence.  During that period, individuals can buy and sell the contract at its fluctuating prices.  The ultimate value of an event contract is determined at its expiration date.  If the underlying event occurs, the holder of the "yes" position is entitled to its full value.  But if the underlying event does not occur, the holder of the "no" position gets the payment.

23.  Traders price event contracts by reference to available information at any given time.  If new information comes to light portending an increase in the likelihood of the event's occurrence, then the event contract's price will increase.  The market prices of event contracts thus reflect probabilistic beliefs about whether the underlying event will occur.  Returning to the earthquake example, a "yes" contract that trades at 30 cents reflects that the market believes that there is a 30% chance of an earthquake this year.  The 30% figure can be informed by datapoints the market deems significant, such as the time since the last earthquake in the area and the frequency of fault line tremors in preceding months surrounding Los Angeles County.

24.  Event contracts are a valuable means to hedge risk against event-driven volatility.  Event contracts reflect real-time risk assessment and thus provide a nuanced and finely tuned opportunity for traders to mitigate their exposure on real-world events in an uncertain market.  There is no other financial instrument with the unique capability to capture the risks of an event with economic consequences.  A property owner in Los Angeles County might purchase an earthquake event contract because the payoff would offset economic losses in the event an earthquake occurs.

25.  Event contracts should not be mistaken for insurance.  While insurance covers property losses, event contracts can cover a wider range of possible economic fallout like

temporary shelter, a decline in rental income, or short-term cost increases for basic needs due to shortages generated by an earthquake.

26.  Event contracts are also valuable means of communicating information to the general public because contract prices reflect prevailing market opinions and conditions.  Prediction markets thus serve as sensitive information-gathering tools that can provide insights for stakeholders—including businesses, individuals, governments, and educational institutions.  The data generated through prediction markets can also help to set rates and prices for assets whose value depends on the occurrence or non-occurrence of the underlying event.

**B.  Congress Delegated The Power To Regulate Event Contracts That Are Offered By A Regulated Exchange To The Commodity Futures Trading Commission.**

27.  Futures contracts have long been regulated by the federal government.  In 1936, Congress passed the CEA which provides for federal regulation of all commodities and futures trading activities and requires that all futures and commodity options are traded on organized, regulated exchanges.

28.  In 1974, Congress established the CFTC as the federal agency empowered to oversee and regulate exchanges under the CEA. Proponents of the 1974 Act were concerned that the "states . . . might step in to regulate the futures markets themselves" which would lead to the undesired outcome that national futures exchanges might be subject to "conflicting regulatory demands."  *Am. Agric. Movement*, 977 F.2d at 1156.  One Senator remarked that "different State laws would just lead to total chaos."  Senate Hearings, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).  As a solution, the House Committee on Agriculture put "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned."  H.R. Rep. No. 93-975, at 79 (1974).  The Senate reaffirmed the CFTC's exclusive power by deleting a provision of the CEA that would have preserved the states' authority over futures trading.  *See* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sens. Curtis and Talmadge).

29.  To offer derivatives for public trading, an entity must seek and receive the CFTC's designation as a contract market.  7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). An entity must first submit an application to the CFTC detailing how the entity complies with the core principles of the CEA.  17 C.F.R. § 38.3(a)(2).  Among other things, the proposed contract market must show that it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation.  17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300.  Proposed exchanges must provide detailed information demonstrating their capacity to abide by the CEA.  17 C.F.R. § 38.3(a)(2).  The CFTC then reviews the application and renders a decision on the purported market's designation within 180 days of submission.  17 C.F.R. § 38.3(a)(2).

30.  Once the CFTC designates an entity as a contract market, the CEA gives the CFTC "exclusive jurisdiction" over the derivatives that are traded on those regulated markets.  7 U.S.C. § 2(a)(1)(A).  Those derivatives include "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of a commodity for future delivery."  *Id.*  This exclusive jurisdiction extends to "event contracts." *See id.* § 1a(47)(A)(ii), (iv), (vi).

31.  Once an exchange is designated as a CEA-compliant contract market, the market is subject to an extensive framework for CFTC oversight.  Part 38 of Title 17, Chapter 1 of the U.S. Code comprehensively regulates designated contract markets, ensuring that these markets continue to comply with the CEA.  Exchanges must meet detailed requirements to maintain good standing as designated contract markets.  17 C.F.R. pt. 38.  Among other things, designated contract markets must abide by recordkeeping requirements that specify the form, manner, and duration of retention.  17 C.F.R. §§ 38.950, 1.31.  Designated contract markets must meet

reporting obligations like furnishing daily reports of market data on futures and swaps to the CFTC. 17 C.F.R. § 38.450, pt. 16. Specific liquidity standards, disciplinary procedures, dispute resolution mechanisms, board of directors requirements, auditing demands, and more are also detailed in Part 38. A designated contract market must comply with all these requirements to comply with the CEA and remain in good standing before the CFTC. 7 U.S.C. § 7(d); 17 C.F.R. pt. 38.

32. As long as the designated contract market abides by the requirements set forth in the CEA, it may list contracts on its exchange without pre-approval from the CFTC. Instead, the exchange may self-certify that the contract complies with applicable law by filing a "written certification" with the CFTC at the time of listing. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). Within 10 days, the CFTC reviews the reports and may initiate review of any contract under its purview. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c). If the CFTC does not take action within the ten-day probationary period, the contract automatically becomes "effective." *See* 7 U.S.C. § 7a-2(c)(2).

33. Alternatively, exchanges may submit contracts to the CFTC for approval prior to listing. 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c). The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA. 7 U.S.C. § 7a-2(c)(5)(B).

34. The CEA's enforcement process rounds out the comprehensive federal framework that regulates futures derivatives sold on designated contract markets. The CEA gives the CFTC discretion as to how to police and enforce violations of the CEA for designated contract markets. The CFTC includes an Enforcement Division, which may initiate investigations and, with the approval of a majority of the CFTC, pursue enforcement actions in federal court or administrative proceedings. If the Division concludes that there has been a violation of the CEA, it may recommend to the Commission that it seek a wide range of enforcement measures including civil monetary penalties, restitution, disgorgement, the suspension, denial, revocation, or restriction of registration and trading privileges, and injunctions or cease-and-desist orders. *See* CFTC Division of Enforcement, Enforcement Manual (2020), at § 3.3. If the Division

suspects that an entity has engaged in criminal violations, the Division may also refer the matter to the Department of Justice or the appropriate state authority for prosecution. *Id.*

35. The CFTC regulates derivatives in products like "wheat, cotton, rice, corn, oats," as well as "excluded commodities" like interest rates, certain financial instruments, economic indices, risk metrics, and events. 7 U.S.C. § 1a(9), (19)(i)–(iv). The CFTC regulates event contracts as a type of derivative referencing an "excluded commodity." *See id.* § 1a(47)(A)(ii), (iv), (vi); *see KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 23-3257 (JMC), 2024 WL 4164694, at *2-3 (D.D.C. Sept. 12, 2024). "Event contracts" are "agreements, contracts, transactions, or swaps in excluded commodities." 7 U.S.C. § 7a-2(c)(5)(C)(i). Events themselves constitute "excluded commodities" under the CEA and are defined as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences. *Id.* § 1a(19)(iv).

36. In 2010, Congress amended the CEA to address event contracts specifically. Congress provided that the CFTC "may"—but need not—conclude that event contracts are "contrary to the public interest" if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i).

**C. After An Extensive Regulatory Process, The CFTC Registered Kalshi As A Contract Market That Operates Under Federal Law.**

37. Kalshi is a regulated exchange and prediction market where users can buy and sell event contracts. In 2020, the CFTC unanimously certified Kalshi as a designated contract market, affirming that its platform complied with the CEA. Since then, Kalshi has been fully regulated as a financial exchange under federal law alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange.

38. Kalshi specializes in event contract trading, offering a secure and federally approved exchange where individual, retail, and institutional participants can hedge their risks on event-based outcomes.

39. Kalshi offers many kinds of events contracts related to an array of substantive areas like climate, technology, health, crypto, popular culture, and economics. For example, Kalshi's platform currently allows users to trade on whether India will meet its 2030 climate goals, or whether the market share for electric vehicles will be above 50% in 2030. Kalshi offers contracts on the outcomes of Supreme Court decisions, congressional votes, weather events, technological benchmarks, markers of cultural influence, and Federal Reserve interest rate decisions.

40. Among its menu of event contracts, Kalshi offers sports-outcome contracts.

41. In accordance with 7 U.S.C. § 7a-2(c)(1) and 17 C.F.R. §§ 40.2(a), Kalshi self-certified and began listing sports-related contracts on its exchange on January 24, 2025. Kalshi's sports-related contracts allow users to place positions on which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Championship. The CFTC has authority to review and prohibit contracts involving gaming if it concludes that they are "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i), but the CFTC declined to review Kalshi's sports-related contracts. Unless and until the CFTC takes action on Kalshi's sports-related contracts, they remain authorized under federal law.

42. Several other federally regulated exchanges began listing sports-related event contracts around the same time period. In response, the CFTC exercised its power to commence review of a sports-related event contract offered by NADEX/crypto.com—a designated contract market that the CFTC certified under the name HedgeStreet in 2004. The CFTC initiated its 90-day review period of the sports-related contracts on January 14, 2025. The Commission requested that NADEX/crypto.com suspend its sports-related contracts during the pendency of the review. But the CFTC never made a similar request to Kalshi.

**D. The New Jersey Division of Gaming Enforcement Threatened Kalshi With Legal Action With Regard To Its Sports-Related Event Contracts.**

43.   On the afternoon of March 27, 2025, the New Jersey Division of Gaming Enforcement (the "Division") sent a cease and desist letter to Tarek Mansour, Kalshi's Chief Executive Officer.  The Division informed Kalshi that it had "accessed [Kalshi's] mobile application and website . . . and [had] determined that [Kalshi] is listing unauthorized sports wagers for individuals located within the State of New Jersey."  Exhibit 1, at 1.  It claimed that Kalshi's conduct "constitutes a violation of the New Jersey Sports Wagering Act."  *Id.* (citing N.J.S.A. 5:12A-11).  The Division added that the state statute "only permits licensed entities to offer sports wagering to patrons located in New Jersey."  *Id.*

44.   Additionally, the Division asserted that "Kalshi is currently offering unauthorized sports wagering to New Jersey residents on collegiate sporting events occurring in New Jersey in violation of the New Jersey Constitution."  *Id.*  (citing N.J. Const. Art. IV, § 7, ¶ 2(D)).

45.   The Division declared that its March 27, 2025 letter served "as official notice that Kalshi, by facilitating and/or accepting unauthorized sports wagering from individuals within the State of New Jersey, is engaging in activity that is unlawful under not only New Jersey law, but New Jersey's Constitution."  *Id.*  The Division further "demand[ed] that [Kalshi] immediately cease and desist from offering any form of sports wagering to New Jersey residents and void any such wagers already placed."  *Id.*  The Division "reserve[d] the right to pursue any appropriate sanctions if [Kalshi] fail[ed] to take immediate corrective action as demanded[.]"  *Id.* at 2.

46.   The Division instructed that Kalshi halt its sports event-based contracts operation in New Jersey by 11:59 PM on March 28, 2025, and that failure to do so would "result in the Division taking further enforcement actions, which may include any measures available under New Jersey law."  *Id.* at 2.

47.   Several hours after receiving the Division's cease and desist letter, Kalshi's counsel and representatives of the Division discussed the Division's concerns regarding Kalshi's sports-based event contracts in New Jersey, including contracts related to upcoming collegiate

basketball games.  The Division demanded that Kalshi unwind any existing contracts relating to those games and cease offering them in the state going forward.  Kalshi agreed to examine the feasibility of addressing the Division's concerns overnight but stressed that its offerings are federally regulated financial products not subject to state-by-state regulation.

48.  Counsel for Kalshi and Division representatives met again on the morning of March 28, 2025.  Kalshi relayed to the Division its conclusion that it was infeasible for the platform to unwind existing contracts related to the collegiate basketball games occurring simultaneously with the Division's request.  Moreover, Kalshi expressed its concern that if it complied with the Division's demands to deny New Jersey users access to its platform, Kalshi risked losing its registration as a designated contract market with the CFTC.  As Kalshi explained, it could not disregard federal law regulating—and possessing exclusive jurisdiction over—the derivatives contracts on its exchange.

49.  Still hoping to find a mutually agreeable solution, however, Kalshi's counsel undertook to determine whether Kalshi could accommodate any of the Division's concerns.

50.  Kalshi's counsel and the Division representatives met again that afternoon in an attempt to reach a mutually agreeable solution.

51.  That evening, however, Kalshi and the New Jersey authorities were unable to reach an agreement regarding the authorities' cease and desist letter.  With the resulting prospect of liability to which Kalshi was subject without relief, Kalshi filed this complaint the next day.

## REQUISITES FOR RELIEF

52.  As a result of Defendants' threatened conduct described above, there is an imminent likelihood that Defendants' forthcoming actions will violate the Supremacy Clause of the U.S. Constitution and subject Kalshi and its customers to irreparable harm.

53.  An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties.  Defendants' conduct alleged herein will result in irreparable injury to Plaintiffs, including but not limited to criminal liability, economic hardship, and impairment of existing contractual relationships.

54.  Plaintiff has no plain, speedy, or adequate remedy at law to address the wrongs described herein.  Plaintiffs therefore seek declaratory and injunctive relief restraining Defendants from enforcing New Jersey law that interferes with the operation and function of Plaintiff's futures market described herein.

## COUNT I
### (Supremacy Clause—Preemption By Commodity Exchange Act)

55.  Plaintiff incorporates all prior paragraphs by reference.

56.  The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding.

57.  The Supremacy Clause mandates that federal law preempt state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government, or where state law conflicts or interferes with federal law.

58.  Congress explicitly gave the CFTC the "exclusive jurisdiction" to regulate futures trading on approved exchanges.  7 U.S.C. § 2(a)(1)(A).  Without a unified approach to futures regulation, Congress feared that fragmented and uncoordinated state regulation would lead to "total chaos."  Senate Hearings, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).  Having analyzed the text, purpose, and history of the CEA, courts nationwide have agreed that Congress intended to preempt state law in futures trading on CFTC-regulated exchanges.  *See, e.g., Am. Agric. Movement*, 977 F.2d at 1156; *Jones v. B.C. Christopher & Co.,* 466 F.Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.,* 459 F.Supp. 733, 737 (N.D. Cal. 1978).

59.  In threatening to enforce N.J.S.A. 5:12A-11 and N.J. Const. Art. IV, § 7, ¶ 2(D) against Kalshi, Defendants are impermissibly intruding on the CFTC's exclusive authority to

regulate futures trading on CFTC-regulated exchanges.  Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "against the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the same subject matter.  Because federal law occupies the entire field of regulating futures trading on regulated markets, the threatened actions are field-preempted under the Supremacy Clause.

60.  New Jersey authorities likewise threatened to deploy New Jersey law in a manner that conflicts with federal law and policy.  Defendants seek to ban event contracts that federal law and the CFTC have authorized, which would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges.  For that reason, the threatened actions are conflict-preempted under the Supremacy Clause.

61.  Defendants may therefore not enforce New Jersey's gambling laws against Kalshi because Kalshi is a federally regulated exchange that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 et seq.

## PRAYER FOR RELIEF

WHERFORE, Plaintiff Kalshi requests that judgment be entered in its favor and against Defendants as follows:

1. Enter a judgment declaring that N.J.S.A. 5:12A-11, N.J. Const. Art. IV, § 7, ¶ 2(D), and any other New Jersey law that is used in a manner to effectively regulate Plaintiff's designated futures market violates the Supremacy Clause of the United States Constitution as applied to Plaintiff, and a declaratory judgment under 28 U.S.C. §§ 2201-2202 saying the same;

2. Enter both a preliminary and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing that N.J.S.A.

5:12A-11, N.J. Const. Art. IV, § 7, ¶ 2(D), and any other New Jersey law that

attempts to effectively regulate Plaintiff's futures market, against Plaintiff;

3.  Any other relief within this Court's discretion that it deems just and proper.

Dated this 29th day of March, 2025.          /s/ Gurbir S. Grewal

                                                      Gurbir S. Grewal
                                                      Milbank LLP
    55 Hudson Yards
    New York, New York 10001
    Telephone: 212-530-5775
    Facsimile: 212-530-5775

    Neal Kumar Katyal (pro hac vice pending)
    Joshua B. Sterling (pro hac vice pending)
    William E. Havemann (pro hac vice pending)
    Milbank LLP
    1850 K Street, Suite 1100
    Washington D.C. 20006
    Telephone: 202-835-7505
    Facsimile: 213-629-5063

    Mackenzie Austin (pro hac vice pending)
    Milbank LLP
    2029 Century Park East, 33rd Floor
    Los Angeles, California 90067
    Telephone: 424-386-4000
    Facsimile: 213-629-5063

    ATTORNEYS FOR PLAINTIFF

<u>**VERIFICATION**</u>

I, Xavier Sottile, Head of Markets at KalshiEx LLC, hereby declare under penalty of perjury that the following statements made by me are true and correct.

1. I am the Head of Markets of Plaintiff, KalshiEx, LLC, in this matter.

2. I have reviewed the Verified Complaint.

3. I know or believe that all the factual allegations of which I have personal knowledge are true.

4. I believe that all the factual allegations of which I do not have personal knowledge are true based on information and belief, documents, or both.

_____
Xavier Sottile

Dated: March 28, 2025