# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KALSHIEX LLC, | Case No.: 25-cv-2152 |
| Plaintiff, | |
| | **PLAINTIFF'S MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| vs. | **(ORAL ARGUMENT REQUESTED)** |
| MARY JO FLAHERTY, in her official capacity as Interim Director of the New Jersey Division of Gaming Enforcement; NEW JERSEY DIVISION OF GAMING ENFORCEMENT; JAMES T. PLOUSIS, in his official capacity as Chairman of the New Jersey Casino Control Commission; ALISA COOPER, in her official capacity as Vice Chair of the New Jersey Casino Control Commission; JOYCE MOLLINEAUX, in her official capacity as Commissioner of the New Jersey Casino Control Commission; NEW JERSEY CASINO CONTROL COMMISSION; and MATTHEW J. PLATKIN, in his official capacity as Attorney General of New Jersey, | |
| Defendants. | |

Plaintiff KalshiEX LLC ("Kalshi") moves this Court for a preliminary injunction or, in the alternative, both a temporary restraining order and preliminary injunction, against Defendants Mary Jo Flaherty, the New Jersey Division of Gaming Enforcement, James T. Plousis, Alisa Cooper, Joyce Mollineaux, the New Jersey Casino Control Commission, and Matthew J. Platkin. This Motion is based upon the pleadings on file herein, including Plaintiff's Complaint, the memorandum of points and authorities contained in this document, all documents on file in this action including exhibits and declarations, and any further arguments presented.

## INTRODUCTION

The New Jersey Division of Gaming Enforcement (the "Division") is unconstitutionally threatening to prohibit all trading of Kalshi's event-based contracts in New Jersey, even though those contracts have been authorized by the Commodity Futures Trading Commission ("CFTC"), the federal agency that Congress endowed with "exclusive jurisdiction" to regulate trading on federally-designated exchanges like Kalshi. The Division's actions threaten irreparable harm to Kalshi and its users, and unless these actions are enjoined, will result in the sort of state-by-state patchwork of regulation that Congress sought to prevent when it subjected CFTC-regulated exchanges to exclusive federal regulation. A temporary restraining order and preliminary injunction are warranted—and desperately needed now.

The Commodity Exchange Act ("CEA") establishes a comprehensive federal framework for regulating commodity futures trading. The CEA explicitly and unambiguously delegates the "exclusive" power to oversee, approve, and regulate futures trading on registered exchanges to a federal agency—the CFTC. 7 U.S.C. § 2(a)(1)(A). In establishing a comprehensive federal framework for regulating commodity futures trading, Congress sought to prevent the "chaos" that would result from subjecting futures trading to a patchwork of conflicting state laws. 7 U.S.C. § 2(a)(1)(A); *see also Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry,* 93d Cong., 2d Sess. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark).

Kalshi is a CFTC-designated contract market that offers sports-event contracts among many others on its federally-registered exchange.  These event contracts are valid under federal law: The CFTC earlier this year unambiguously permitted Kalshi to offer sports-event contracts.  Nonetheless, New Jersey authorities issued a letter yesterday threatening Kalshi and its representatives with potential criminal and civil penalties unless Kalshi immediately halts access to these federally approved contracts for users in New Jersey.

The Division's attempt to regulate trading on a federally-regulated exchange is preempted by federal law.  As the CFTC informed the U.S. Court of Appeals for the D.C. Circuit just a few months ago, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a [designated contract market]" like Kalshi.  CFTC Brief at *27, *KalshiEx LLC v. CFTC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) (emphasis added).  Kalshi therefore filed this action seeking declaratory and injunctive relief to prevent Defendants—the Division and its Interim Director, the New Jersey Casino Control Commission and its members, and the Attorney General—from enforcing preempted state laws against Kalshi.

But immediate action is required to avoid irreparable harm to Kalshi, its representatives, and its users.  As described in more detail in the attached declaration, without preliminary relief, Kalshi will incur irreparable harm no matter how it chooses to respond to the Division's unconstitutional demand.  If Kalshi chooses not to comply, the company and its representatives face the prospect of civil and criminal liability.  But if Kalshi bows to the Division and attempts to comply, it will incur massive and irrevocable economic costs, impose significant harms on users with investments on the platform, imperil its federal registration, and undermine the public's confidence in the integrity of its platform.  Accordingly, Kalshi respectfully requests that this Court issue a preliminary injunction—and possibly a temporary restraining order ("TRO")—enjoining Defendants from enforcing preempted state laws against Kalshi.  This relief is needed to prevent irreparable harm and allow Kalshi to litigate its preemption claim free from the threat of criminal and civil liability and without incurring the extraordinary harms that would result from even temporary compliance with the Division's unconstitutional demands.

Kalshi has endeavored in good faith to reach an accommodation with the Division, but the parties were unable to agree. Given the cease and desist letter's deadline of 11:59 PM last night, Kalshi earlier yesterday evening informed counsel for the Division of Kalshi's intent to file suit and seek a TRO and preliminary injunction. As a courtesy to Kalshi, and to avoid the need for emergency proceedings before this Court, counsel for the Division agreed to extend the deadline of its cease and desist letter and thereby preserve the status quo for 10 days—until Monday, April 7, 2025. If this Court is able to resolve Kalshi's motion for a preliminary injunction by that date, no TRO would be needed. If, however, the Court is unable to resolve the request for a preliminary injunction by April 7, Kalshi respectfully requests that the Court enter a TRO no later than that date. Kalshi is prepared to appear for a hearing on any date of the Court's choosing.

## BACKGROUND

### A. The Exclusive Federal Scheme For Regulating Futures Markets On Regulated Exchanges

Derivative contracts are financial tools that traders use to mitigate risk. *See KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257 (JMC), 2024 WL 4164694, at *1-2 (D.D.C. Sept. 12, 2024). Event contracts are a type of derivative contract—they are financial instruments that identify a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. *Id.* at *2. Event contracts are typically traded on an exchange, and their value is determined by market forces. *Id.* This means that the price of an event contract fluctuates from the time of its creation to its expiration date in accordance with the changing likelihood of the event's occurrence, creating a uniquely sensitive financial instrument that tracks real-world market perceptions. *Id.* During the period of a contract, individuals can buy and sell the contract at its changing prices; no user is locked into a contract and may trade her contract in accordance with her desire to hedge her economic risk. Compl. ¶ 22. The ultimate value of an event contract is determined at its expiration date—most commonly, the event's occurrence or a set date upon which the contract terminates. *See*

*KalshiEx*, 2024 WL 4164694, at *2.  For example, a property owner on the Gulf Coast may place a position on whether a hurricane will strike the area around his property within the 2025 calendar year.  *Id.*  If a hurricane strikes, the property owner will receive the ultimate value of the contract, and can thereby hedge risk by offsetting losses incurred as a result of the hurricane.  *Id.*

Congress passed the CEA in 1936 to regulate the derivatives market.  In 1974, Congress passed a series of amendments to update the regulatory framework for commodities futures given rapid developments in the market.  Compl. ¶ 28.  A key part of this modernization effort was the establishment of the CFTC, which Congress established as the federal agency empowered to oversee and regulate exchanges under the CEA.  *Id.*  The centralization of authority in the CFTC was borne of Congress's fear that subjecting exchanges to different regulatory regimes would wreak havoc in the futures market.  *Id.*  Congress was particularly concerned that "states . . . might step in to regulate the futures markets themselves."  *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 (7th Cir. 1995).  Applying different State laws to futures trading "would just lead to total chaos." Senate Hearings, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

During the runup to passage of the 1974 amendments, the Senate deleted a provision of the CEA that would have preserved states' authority over futures trading—eliminating any doubt as to the CFTC's exclusive power to regulate futures trading.  *See* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sens. Curtis and Talmadge).  Congress, however, limited the CFTC's power to contract markets that are *registered* and *designated* with the CFTC.  Unregistered futures markets remain subject to state regulation.

The CFTC's regulatory framework is extensive, comprehensive, and exclusive.  To obtain approval from the CFTC, an exchange must first apply and receive the CFTC's designation as a contract market.  7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. §§ 38.3(a).  The exchange's application must detail its capacity to comply with all CFTC rules and regulations through a

series of written submissions and exhibits.  17 C.F.R. § 38.3(a)(2).  The CFTC then reviews the application and renders a decision on the exchange's designation.  *Id.*

Once the CFTC designates an entity as a contract market, the CFTC has "exclusive jurisdiction" over derivatives traded on the market, including "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A).  This exclusive jurisdiction extends to "event contracts."  *See id.* § 1a(47)(A)(ii), (iv), (vi).

Exchanges under the CFTC's jurisdiction are subject to the CFTC's extensive regulatory framework as set out in Part 38 of Title 17 of the U.S. Code and in CFTC regulations.  Together, these provisions establish a comprehensive scheme for regulating designated contract markets. The CEA imposes a series of detailed requirements for exchanges to maintain good standing as designated contract markets, requiring exchanges to comply with 23 separate "Core Principles." 17 C.F.R. pt. 38.  Among other things, exchanges must abide by recordkeeping requirements that specify the form, manner, and duration of retention of documents.  17 C.F.R. §§ 38.950, 1.31. Exchanges must meet reporting obligations like furnishing daily reports of market data on futures and swaps to the CFTC.  17 C.F.R. § 38.450, pt. 16.  Exchanges are further subject to liquidity standards, disciplinary procedures, dispute-resolution mechanisms, board-of-directors requirements, auditing demands, and many other regulations all set by federal law.  *See* 17 C.F.R. pt. 38.  Exchanges must comply with all these requirements to remain in good standing before the CFTC.  7 U.S.C. § 7(d); 17 C.F.R. pt. 38.  If an exchange violates any of the provisions of the CEA or the CFTC's regulations, the CFTC is authorized to "suspend" or "revoke" the market's "designation or registration."  7 U.S.C. § 8(b).  Suspension or revocation of an exchange's license is "final and conclusive" and appealable only to a federal court of appeals.  *Id.*

The CEA prescribes a specific method by which the CFTC may approve new contracts on regulated exchanges.  A designated contract market that abides by the requirements set forth in the CEA may list contracts on its exchange without pre-approval from the CFTC by self-certifying that the contracts comply with CFTC requirements.  7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a).  The CFTC reviews proposed contracts and may initiate review of any contract within 10 days of receiving notice.  *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. §40.11(c).  Alternatively, exchanges may submit contracts to the CFTC for approval prior to listing.  7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c).  The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA or CFTC regulations.  7 U.S.C. § 7a-2(c)(5)(B).  If an entity offers a contract in violation of the CEA or CFTC regulations, the CFTC has an array of enforcement mechanisms, including but not limited to revocation of licensing, civil penalties, and criminal enforcement.

The CEA contains a "Special Rule" addressing event contracts.  The Special Rule authorizes the CFTC to review and prohibit specific types of event contracts that it determines to be "contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C)(i).  The CEA provides that the CFTC "may"—but need not—deem event contracts contrary to the public interest if they "involve":

    (I)      activity that is unlawful under any Federal or State law;
    (II)     terrorism;
    (III)    assassination;
    (IV)    war;
    (V)     gaming; or
    (VI)    other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

*Id.*; *see also* 17 C.F.R. § 40.11(a)(1)–(2) (implementing Special Rule).  The decision to prohibit an event contract that falls within any of these categories is discretionary, subject to the CFTC's evaluation of the "public interest."

**B. Kalshi's Registration As A CFTC-Designated Contract Market Under Federal Law**

In 2020, the CFTC unanimously certified Kalshi as a designated contract market, affirming that its platform complied with the CEA's regulatory requirements. *See KalshiEX LLC*, 2024 WL 4164694, at *4. Since then, Kalshi has been fully regulated as a derivatives exchange under federal law alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange. Compl. ¶ 37. The company offers a user-friendly and accessible platform where individual, retail, and institutional participants can hedge their risks on event-based outcomes. Compl. ¶¶ 38-39.

Because Kalshi is a CFTC-designated contract market, its event contracts are subject to the "exclusive jurisdiction" of the CFTC. 7 U.S.C. § 2(a)(1)(A). As a result of being a CFTC-designated contract market, Kalshi is required by federal law to comply with a host of federal requirements designed to ensure market integrity. An exchange's status as a CFTC-designated contract market "imposes upon it a duty of self-regulation, subject to the Commission's oversight," requiring the exchange to "enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent price manipulation, cornering and other market disturbances." *Am. Agric. Movement, Inc.*, 977 F.2d at 1150–51. Among other things, Kalshi must "make public daily information on settlement prices, volume, open interest, and opening and closing ranges for actively traded contracts on the contract market," 17 C.F.R. § 38.450, pt. 16; it must keep records of most transactions for at least 5 years, *id.* §§ 38.950, 1.31(b)(1); it must offer "impartial access" to its platform, *id.* § 38.151(b); it must prevent price manipulation, *id.* § 38.200; it must make its records "open to inspection by any representative of the [CFTC] or the United States Department of Justice," *id.* § 1.31(d)(1); and it must maintain financial resources "at least equal to a total amount that would enable the designated contract market" to "cover its operating costs for a period of at least one year," *id.* § 38.1101(a)(2).

Kalshi offers many kinds of event contracts related to climate, technology, health, crypto, popular culture, and economics. Compl. ¶ 39. For example, Kalshi's platform currently allows users to trade on whether India will meet its 2030 climate goals, or whether the market share for

electric vehicles will be above 50% in 2030. Kalshi also offers sports-related contracts, which are the subject of the present suit. *Id.* ¶¶ 39-40.

Kalshi self-certified and began listing sports-related contracts on its exchange on January 24, 2025, allowing users to place positions on, for example, which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Tournament. Compl. ¶ 41. The CFTC declined to exercise its power under the CEA to initiate review Kalshi's sports-related contracts. *Id.* Thus, upon the expiration of the 10-day probationary period under 7 U.S.C. § 7a-2(c)(2), Kalshi's sports-related contracts were approved by the CFTC and remain legal under federal law. *Id.* While federal law gives the CFTC discretion to prohibit contracts it considers "gaming" and believes to be contrary to the public interest, the CFTC has declined to do so for Kalshi's contracts.

Kalshi's sports-related contracts involve the outcomes of sporting events, but there are crucial differences between Kalshi's exchange and a sportsbook that justify the very different regulatory models under which they function. A financial exchange is an investment marketplace where traders enter into contracts with other traders—not with a casino or "house." In financial exchanges for event contracts, moreover, the market sets the contract price rather than the price being set by the house. New facts on the ground and other trading activity can cause the price of the contract to fluctuate over the pendency of the contract, and traders can enter and exit whenever they want according to movements in the market. For sportsbooks, by contrast, gamblers take a position against the house, and the house sets the line with the odds in its own favor. Declaration of Xavier Sottile ¶ 26. Betting against the house thus stacks the odds in the house's favor, whereas entering into event contracts with other sophisticated traders will ultimately net out. Longitudinal studies bear out this difference: Speaking broadly, the house profits on sports bets in the long-term whereas tailored investment strategies on financial markets result in positive returns for all traders. Xuesong Shang, Hebing Duan, & Jingyi Lu, *Gambling versus Investment: Lay Theory and Loss Aversion*, 84 Journal of Economic Psychology 1, 2 (2021) (summarizing the literature).

These differences result in different modes of regulation.  Given the power imbalance between the house and the gambler, and the potential for abuse that can result from this imbalance, gambling falls within the traditional police powers of the state and is regulated by state law to protect against exploitative activity within its jurisdiction.  *See Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003).  By contrast, an exchange like Kalshi operates a marketplace that facilitates complex interstate transactions between traders.  Federal law focuses on preventing market manipulation and disruption and ensuring market efficiency nationwide.  *See* 17 C.F.R. §§ 38.250, 38.151.  For that reason, the CFTC polices transactions on federally-regulated exchanges like Kalshi under federal law.  *See Am. Agric. Movement*, 977 F.2d at 1156.

### C. The New Jersey Regulatory Scheme For Gaming And Gambling

New Jersey deploys a two-tiered system of regulatory oversight for gaming and gambling within the state.  Compl. ¶¶ 14, 18.  The New Jersey Division of Gaming Enforcement serves as the enforcement and investigative body for the state's gaming industry.  *Id.* ¶ 14.  The New Jersey Casino Control Commission, by contrast, is a quasi-judicial panel that licenses New Jersey casinos and their key employees.  It also holds hearings on contested licensing matters and appeals from decisions of the New Jersey Division of Gaming Enforcement.  *Id.* ¶ 18.  Together, these entities administer and enforce the laws regulating gaming and gambling throughout New Jersey.

Particularly relevant to the present dispute are New Jersey's laws prohibiting unlicensed sports wagering and its state constitutional provision prohibiting "wagering . . . on a college sport or athletic event that takes place in New Jersey or on a sport or athletic event in which any New Jersey college team participates regardless of where the event takes place."  Compl. ¶¶ 43-44 (citing N.J.S.A. 5:12A-11 and N.J. Const. Art. IV, § 7, ¶ 2(D)).  Even for athletic events that are not subject to New Jersey's constitutional gaming prohibition, under state law, no "sports pool or online sports pool shall be offered or made available for wagering to the public by any entity other than a sports wagering licensee[.]"  N.J.S.A. 5:12A-11(c).

To Plaintiff's knowledge, the Division had never attempted to require a state license from a CFTC-designated contract market—that is, until this case.  On March 27, 2025, the Division sent a cease-and-desist letter to Tarek Mansour, Kalshi's Chief Executive Officer, claiming that Kalshi is "listing unauthorized sports wagers for individuals located within the State of New Jersey" in violation the New Jersey Sports Wagering Act.  Exhibit 1, at 1 (citing N.J.S.A. 5:12A-11).  The Division also asserted that "Kalshi is currently offering unauthorized sports wagering to New Jersey residents on collegiate sporting events occurring in New Jersey in violation of the New Jersey Constitution."  *Id.*  (citing N.J. Const. Art. IV, § 7, ¶ 2(D)).  The Division "demand[ed] that [Kalshi] immediately cease and desist from offering any form of sports wagering to New Jersey residents and void any such wagers already placed."  *Id.*  The Division "reserve[d] the right to pursue any appropriate sanctions if [Kalshi] fail[ed] to take immediate corrective action as demanded[.]"  *Id.* at 2.

The Division demanded that Kalshi halt its sports-event-based contracts in New Jersey by 11:59 PM on March 28, 2025, and indicated that failure to do so would "result in the Division taking further enforcement actions, which may include any measures available under New Jersey law."  *Id.* at 2.  Notably, violations of the New Jersey Sports Wagering Act are punishable as "crime[s] of the fourth degree" or by fines of up to $100,000.  N.J.S.A. 5:12A-11(c), N.J.S.A. 2C:43-2.

Counsel for Kalshi and representatives of the Division met twice on March 28, 2025, but were unable to agree on a path forward that would allow Kalshi to comply with the Division's demands.  Kalshi therefore informed the Division of its intent to file suit and seek preliminary injunctive relief.  To avoid the need for emergency proceedings before this Court, however, counsel for the Division agreed to extend the deadline of its cease and desist letter and thereby preserve the status quo for 10 days—until Monday, April 7, 2025.  Kalshi hopes that this extension will allow for a more orderly resolution of Kalshi's request for preliminary relief and avoid any need for emergency weekend proceedings.

As soon as the deadline of the cease and desist order expires, however, the Division's demand that Kalshi cease its sports event-based contracts or face criminal and civil liability will subject Kalshi and its users to immediate harm.  It will require Kalshi to either subject itself to the possibility of criminal liability, or else cut off New Jersey from its contracts on a dime. Cutting off contracts to users in New Jersey would create massive technical challenges for Kalshi—which, as a federally-regulated exchange, has never had any reason to comprehensively geolocate its users on a state-by-state basis, and which would face substantial obstacles to determining a permissible and fair method for cutting an entire state off from exchanges where residents already have assets invested.  Cutting off contracts to New Jersey would also risk serious harm to Kalshi's users, who would be forced to liquidate their positions immediately or otherwise lose access to their capital and assets on the platform.

Because the Division lacks authority to intrude on the CFTC's exclusive jurisdiction to regulate Kalshi's event contracts, Kalshi brought suit seeking declaratory and injunctive relief. Kalshi now respectfully seeks a preliminary injunction by April 7, 2025 to prevent the irreparable and immediate harm created by the Division's actions. Should the Court be unable to resolve Kalshi's request for a preliminary injunction by April 7, Kalshi respectfully requests that the Court enter a TRO before that date, with proceedings on the preliminary injunction to follow.

## ARGUMENT

Kalshi is entitled to a preliminary injunction, and, if necessary, an interim TRO.  Federal Rule of Civil Procedure 65 governs the issuance of both forms of relief, and "[a]pplications for temporary restraining orders are governed by the same standards as motions for preliminary injunctions." *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 777 (D.N.J. 2013).  In both instances, the moving party must demonstrate that:  (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest.  *See Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).  Kalshi meets each element of the inquiry.

### A. Kalshi Is Likely To Succeed Because New Jersey's Gambling Laws Are Preempted By The CEA And Its Implementing Regulations.

A "fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Federal law can preempt state law either expressly or impliedly. One manner of implied preemption is known as field preemption, which occurs where Congress manifests an intent to exclusively occupy an entire field of regulation. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Alternatively, federal law can preempt state law where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," known as conflict preemption. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

It is well-settled that the CEA and its implementing regulations have "resulted in the preemption of all other would-be regulators at every level of government." Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 2 (1976). New Jersey state gambling law is no exception. The CEA and the CFTC's regulations preempt New Jersey law as applied to Kalshi.

1. New Jersey Laws Are Field-Preempted As Applied To Kalshi.

Field preemption exists where a federal regulatory scheme is "so pervasive as to make reasonable the inference that [it] left no room for the States to supplement it." *de la Cuesta*, 458 U.S. at 153 (quotation omitted). The "ultimate touchstone" of the pre-emption analysis is the "purpose of Congress." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992). Congress's intent to occupy a field can be apparent in the statutory text and legislative history. *See, e.g., Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203-13 (1983). Courts can also infer field preemption from a scheme of "federal statutory directives" that "provide a full set of standards . . . designed [to function] as a 'harmonious whole.'" *Arizona v. United States*, 567 U.S. 387, 401 (2012) (quoting *Hines*, 312 U.S. at 72). "Where Congress occupies an entire field . . . even *complementary* state regulation is impermissible." *Id.* (emphasis added).

The statutory text, legislative history, and comprehensive regulatory framework of the CEA clearly evince Congress's intent to occupy the field of futures trading on CFTC-regulated exchanges. For that reason, the Division's effort to subject Kalshi to criminal and civil liability based on its event contracts is preempted.

*Statutory Text*: Congress initially passed the CEA in 1936, then overhauled it in a series of amendments known as the 1974 Act. The text of the 1974 Act could hardly be clearer. Congress established the CFTC and granted it "*exclusive jurisdiction*" over all "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A) (emphasis added). Kalshi's event contracts are traded on a contract market designated by the CFTC, and the CFTC therefore has "exclusive jurisdiction" to regulate these contracts.

Congress in the 1974 Act did not preempt regulation of *all* derivatives contracts. Instead, Congress cabined federal preemption to contracts traded *on CFTC-approved exchanges*. The statute preserves concurrent state regulation for commodities and futures contracts traded *outside* of CFTC-approved exchanges. For example, 7 U.S.C. § 16(e) notes that the chapter does not "supersede or preempt" the application of federal or state statutes to entities that are "required to be registered or designated" with the CFTC but "fail or refuse" to do so. In other words, Congress granted the CFTC exclusive power to regulate contracts traded on the exchanges it oversees but permitted federal and state agencies to police "those who offer fraudulent *off-exchange* investments" and other "transactions *outside* those preserved exclusively for the jurisdiction of the CFTC." H.R. Rep. No. 97-565, pt. 1, at 43 (1982) (emphasis added). Thus, federal preemption of the New Jersey law as to Kalshi does not call into question the state's regulation of casinos or other gambling establishments, none of which are CFTC-designated exchanges and are fundamentally different businesses than those exchanges.

For CFTC-designated exchanges like Kalshi, however, the CFTC has "exclusive jurisdiction." 7 U.S.C. 2(a)(1)(A). Courts have easily found that statutes containing similar

language preempt parallel state law regulation.  *See Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 594-95 (7th Cir. 2001) (holding that statute's "exclusive jurisdiction" provision preempts state law claims); *BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 765 (9th Cir. 2018) (statute's "exclusive" jurisdiction provision had "very broad[]" preemptive reach).  As the CFTC itself recently explained to the D.C. Circuit, "due to federal preemption, event contracts *never violate state law when they are traded on a [designated contract market].*" CFTC Brief at *27, *KalshiEx LLC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) (emphasis added).

<u>*Statutory Purpose*</u>:  Congress in the 1974 Act sought to regulate the rapidly growing commodity futures market, and also sought to prevent exchanges from being subjected to fragmented regulatory demands that could differ from one jurisdiction to the next.  One "aim" of the 1974 Act was to "avoid unnecessary, overlapping and duplicative regulation." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001).  In addition to fears about overlapping demands with the Securities and Exchange Commission, Congress worried that "the states . . . might step in to regulate the futures markets themselves." *Am. Agric. Movement*, 977 F.2d at 1156.  As one sponsor of the 1974 Act explained, "different State laws would just lead to total chaos."  Senate Hearings, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

Congress's solution was to place "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned."  H.R. Rep. No. 93-975, at 79 (1974); *see also* Graham Purcell & Abelardo Lopez Valdez, *The Commodity Futures Trading Commission Act of 1974: Regulatory Legislation for Commodity Futures Trading in a Market–Oriented Economy,* 21 S.D. L. Rev. 555, 573–74 (1976).  The Conference Report confirmed Congress's intent to preempt the field: "Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) *would preempt the field insofar as futures regulation is concerned*."  Senate Comm. on Agriculture, Nutrition and Forestry, 93d Cong., 2d Sess., *Commodity Futures Trading Comm'n Act of 1974*, at 11 (Comm. Print 1974) (emphasis added).

Courts agree that Congress intended to preclude states from exercising parallel authority over commodity futures trading in exchanges designated by the CFTC.  *See, e.g.*, *FTC v. Ken Roberts Co.*, 276 F.3d 583, 590-91 (D.C. Cir. 2001) ("the statute's legislative history repeatedly emphasizes that the CFTC's jurisdiction was 'to be exclusive with regard to the trading of futures *on organized contract markets*'") (quoting S. Rep. No. 93-1131, at 23 (1974) (emphasis in original)); *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979) ("It is now established, however, that the SEC and other federal agencies are 'stripped' of authority to regulate commodities transactions, and that state regulatory agencies are likewise preempted by the 'exclusive jurisdiction' of the CFTC.") (citations omitted); *Hofmayer v. Dean Witter & Co., Inc.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978) ("In the light of Congress' plainly stated intent to have the Commodity Exchange Act, as amended, preempt the field of regulation of commodity futures trading, any claim under federal or state securities statutes is barred."); *Bartels v. Int'l Commodities Corp.*, 435 F.Supp. 865, 868-69 (D. Conn. 1977); *Int'l Trading Ltd. v. Bell*, 262 Ark. 244, 250-51 (1977); *Taylor v. Bear Stearns & Co.*, 572 F. Supp. 667, 673 (N.D. Ga. 1983) (noting that "the primary concern of Congress was preemption of federal and state regulatory schemes").  That is no less true given that one of the state provisions at issue here is a clause of the New Jersey constitution: "[T]he federal Constitution provides that every federal enactment is superior to any state law or *constitutional article*." *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 475 (4th Cir. 2014) (emphasis added); *see also* U.S. Const. Art. VI (federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the *Constitution* or Laws of any State to the Contrary notwithstanding") (emphasis added).

*Drafting history*:  The drafting history of the 1974 Act eliminates all doubt as to Congress's intent to preempt state laws like those Defendants have threatened to enforce against Kalshi.  During consideration of the amendments, the Senate deleted a provision which would have preserved the states' authority over futures trading.  *See* Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 687-88 (1982); *see also* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sens. Curtis and Talmadge).  The Senate accompanied

the deletion with an unequivocal statement as to the supremacy of federal law in the field: "[W]here the jurisdiction of the Commodity Futures Trading Commission is applicable, it supersedes State as well as Federal agencies." S. Rep. No. 93-1131, at 23 (1974). "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987). The Senate's decision to delete the provision allowing concurrent state jurisdiction is yet further proof of Congress's intent to preempt parallel state regulation.

<u>Comprehensive regulatory scheme</u>:  The comprehensive nature of the regulatory scheme Congress created for CFTC-authorized exchanges is further evidence that Congress intended to foreclose concurrent state jurisdiction. *See Arizona*, 567 U.S. at 401 ("comprehensive" nature of federal scheme indicates field preemption); *La. Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 368-69 (1986) (preemption required "where Congress has legislated comprehensively," thus "leaving no room for the States to supplement federal law").

As the Supreme Court has noted, the CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 356 (1982) (quoting H.R. Rep. No. 93-975, at 1 (1974)). An exchange may only offer futures contracts after receiving the CFTC's designation as a regulated exchange. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.100. To receive a CFTC designation, an exchange must first submit a detailed application to the CFTC explaining how the exchange has the capacity to comply with the CFTC's myriad regulations. 17 C.F.R. § 38.3(a). The CFTC then undergoes a comprehensive review of the entity's application to determine whether it meets the CFTC's standards. 17 C.F.R. § 38.3(a)(2).

Once an entity receives the CFTC's designation as a federally-regulated contract market, Congress gave the CFTC "exclusive jurisdiction" over the derivatives traded on the market. 7 U.S.C. § 2(a)(1)(A). Designated contract markets are subject to an extensive framework of CFTC oversight, involving recordkeeping requirements, 17 C.F.R. §§ 38.950, 1.31, reporting

obligations, *id.* § 38.450, pt. 16, liquidity standards, *id.* § 38.1101(a)(2), and penalties for noncompliance, *id.* pt. 38. And Congress elected to allow CFTC-designated exchanges to list contracts—including event contracts—by self-certifying that the contract complies with the CEA's requirements. Congress then gave the CFTC the back-end authority to conduct a review of the contract if it believes the contract may run afoul of any statute or regulation. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c). Failure to abide by the CFTC's contract determinations can result in civil and criminal penalties, which the CFTC may pursue at its discretion.

Of particular relevance here, the CEA specifically authorizes the CFTC to reject event contracts if the Commission deems them to be "contrary to the public interest" and if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The statute is not mandatory—the CFTC "may" conclude that the contract is against the public interest if it falls within one of the enumerated categories. *Id.* Congress left the decision about the public interest to one federal authority—not 50 separate states.

This comprehensive regulatory scheme for regulating futures contracts traded on licensed exchanges evinces a strong congressional intent to preempt the field. Congress's framework strikes a careful balance between regulating futures contracts and allowing for economic growth and flexibility. The Division's attempt to subject Kalshi to New Jersey state law short-circuits that careful balance and usurps authority Congress granted the CFTC.

2. New Jersey Laws Are Conflict-Preempted As Applied To Kalshi.

New Jersey's gambling laws are also conflict-preempted as applied to Kalshi because they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" as evidenced in the CEA. *Hines*, 312 U.S. at 67. Conflicts may exist with respect to "the practical result of the state law" as well as "the means that a state utilizes to accomplish the goal." *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012). "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else

- 17 -

must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Crosby*, 530 U.S. at 373–74 (citing *Savage v. Jones*, 225 U.S. 501, 533 (1912)).

In at least four respects, subjecting Kalshi's contracts to New Jersey law would "undermine[] the intended purpose and 'natural effect'" of the federal scheme for regulating CFTC-designated exchanges. *Id.* at 373.

*First*, Congress passed the 1974 Amendments to the CEA to bring futures markets regulation "under a uniform set of regulations." *Am. Agric. Movement, Inc.*, 977 F.2d at 1156. "As Congress recognized in enacting the 1974 Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *Id.* In holding a state common-law claim preempted by the CEA, the Seventh Circuit explained that "[w]hen application of state law would directly affect trading on or the operation of a futures market, it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Id.* at 1156-57 (citation omitted).

The Division's actions clearly conflict with Congress's goal to avoid subjecting regulated exchanges to multiple conflicting legal regimes. As explained in the Division's cease-and-desist letter, there can be no doubt that the Division intends to deploy state laws to regulate Kalshi's contract market—exactly what Congress did not want states to regulate. The conflict is even clearer when considering the possibility that, if the Division is permitted to proceed here, 49 other states and the District of Columbia could equally attempt to subject Kalshi to their own state laws. Applying state laws to designated contract markets would plainly erect "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines*, 312 U.S. at 67. These laws are preempted.

*Second*, "a conflict in the method of enforcement" likewise leads to preemption. *Arizona*, 567 U.S. at 406. A state law stands as "obstacle" to a federal regulatory scheme if Congress chooses a specific enforcement method to achieve federal goals and a state law adopts a different

method of enforcement that hampers "the careful balance struck by Congress." *Id.* In particular, where Congress reserves "discretion" over violations for federal authorities, a state regime that allows for state prosecutions of the same actions "violates" the well-settled federal scheme. *Id.* at 409. Otherwise, a state could bring charges against an individual "even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402.

That is exactly the risk posed by the Division's actions here. Under federal law, once Kalshi was approved as a CFTC-designated contract market, Kalshi was authorized to list its event contracts for trading by self-certifying that these contracts comported with federal law. The CFTC had the authority to review that self-certification on the ground that these contacts were "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i), but chose not to do so. The CFTC's enforcement division has authority to investigate and, with the approval of the Commission, initiate enforcement actions seeking an array of penalties in federal court or administrative proceedings before the CFTC if it concluded that Kalshi violated any federal law—but, again, it chose not to do so. *See* CFTC Division of Enforcement, Enforcement Manual (2020), at § 3.3. Congress thus gave the CFTC a variety of tools for enforcing federal law against federally designated contract markets and entrusted the CFTC with discretion to pursue penalties it deems most appropriate.

Subjecting federally-regulated exchanges to state laws like New Jersey's would "undermine[] the congressional calibration of force." *Crosby*, 530 U.S. at 380. New Jersey criminal law imposes penalties that would substantially interfere with the CFTC's discretion. For example, New Jersey authorities threatened Kalshi with violation of N.J.S.A. 5:12A-11—a "crime of the fourth degree," which "*shall*" be punished with "a fine of up to $100,000" for corporations and "any other appropriate disposition" including imprisonment for corporate representatives, N.J.S.A. 5:12A-11(c), N.J.S.A. 2C:43-2. Absent a finding of preemption, the carefully calibrated federal enforcement scheme would be displaced by a blunt application of mandatory state criminal penalties. *See Crosby*, 530 U.S. at 373–74 (finding conflict preemption

- 19 -

where state regulatory scheme "undermin[ed]" congressional "delegation of effective discretion" to the executive).

*Third*, the CFTC has already considered and authorized Kalshi's sports-related contracts. Allowing New Jersey to prohibit those contracts would squarely conflict with how those contracts are regulated at the federal level.

Kalshi self-certified and began listing sports-related contracts on its exchange earlier this year. Pursuant to 7 U.S.C. § 7a-2(c)(2), the CFTC was authorized to "stay[] the certification" of the sports-related contracts to allow for CFTC review if it concluded that the contracts were contrary to the public interest. The CFTC chose not to exercise that discretion, however, and thereby authorized these contracts on February 7, 2025. *KalshiEX LLC*, 119 F.4th at 67. To this day, sports-related contracts on Kalshi's exchange are legal under federal law, and unless and until the CFTC attempts to regulate those contracts, they will remain so. But the Division now claims the authority to regulate Kalshi based on its assessment of New Jersey law that is in direct conflict with the CFTC's evaluation of the public interest. Allowing New Jersey—not to mention the other 49 states—to substitute the CFTC's judgment about the public interest with its own state law would create a direct conflict.

*Fourth*, the Division's demands conflict with the CFTC Core Principles on which Kalshi's designation as a CFTC-approved market depends. The CFTC's Core Principle 2 requires Kalshi to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services." 17 C.F.R. §§ 38.150, 38.151(b) (emphasis added). Cutting off New Jersey residents from Kalshi's platform— including residents with ongoing investments—would be in considerable tension with that principle. In addition, Core Principle 4 requires Kalshi to "establish and maintain risk control mechanisms to prevent and reduce the potential risk of *price distortions and market disruptions*." 17 C.F.R. § 38.255 (emphasis added). Again, abruptly closing Kalshi's sports-related contracts to anyone located in New Jersey could constitute exactly the sort of market disruption the CFTC has directed Kalshi to prevent. Depending on the CFTC's interpretation of its Core Principles, it

could well be "impossible for [Kalshi] to comply with both state and federal law"—the paradigmatic case for preemption. *Crosby*, 530 U.S. at 372.

### B. Kalshi Will Suffer Irreparable Harm Without A TRO And Preliminary Injunction.

The Division's acts threaten Kalshi with existential harm. In the absence of relief before April 7, Kalshi will suffer irreparable harm along several dimensions.

*First*, if Kalshi chooses not to comply with the Division's unconstitutional threats, Kalshi and its officers face the extraordinary harms associated with the threat of civil liability and criminal prosecution. As the Supreme Court has recognized, a plaintiff establishes a likelihood of irreparable harm when it demonstrates a credible threat of prosecution under a preempted state statute. *See also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). In Kalshi's case, the threat of prosecution is actual and imminent. The Division expressly threatened Kalshi and its representatives with "sanctions" if it failed to cease offering its sports-based contracts in New Jersey, and cited provisions carrying both civil and criminal penalties. Exhibit 1, at 1-2.

The Division's threat not only subjects Kalshi's officers to the prospect of criminal liability but also generates uncertainty. Kalshi relies on partnerships to manage its exchange and comply with federal law. But its partners will be deterred from continuing their relationships with Kalshi in New Jersey, and possibly elsewhere, in light of the threat of liability. One of Kalshi's partners, for example, has already declined to roll out a partnership with Kalshi in New Jersey as a direct response to the cease-and-desist letter. Declaration of Xavier Sottile ¶ 48. Thus, the cease-and-desist letter alone suffices to prove irreparable harm.

*Second*, attempting to comply with the Division's unconstitutional threat would subject Kalshi to extensive harms that could not be remedied even if it ultimately prevailed in this litigation. Kalshi has more than 34,000 users in New Jersey, many of whom have open investments on the platform. *Id.* ¶ 47. If Kalshi complied with the Division's unconstitutional threat during the pendency of this litigation, it would forego business in this important market, without any prospect of recouping its losses even if it ultimately prevails. Moreover, it is not at

all clear that Kalshi has the capacity to comply with the threat to cease "immediate[ly]" as the Division demands, and any attempt at comply would subject Kalshi to extraordinary technological challenges and costs.  As explained in detail in the accompanying declaration, Kalshi has no need currently to comprehensively geolocate its users on a state-by-state basis because it is regulated federally rather than state-by-state. *Id.* ¶ 18.  Attempting to implement geolocation capabilities would take months and cost tens of millions of dollars annually, *Id.* ¶ 21—again, with no prospect of recouping these losses if Kalshi ultimately prevails.

*Third*, preliminary relief is needed not just to protect Kalshi, but also Kalshi's users. Users who trade on Kalshi's platform enter into event contracts with other users.  Immediately shuttering access to these contracts for New Jersey users could require Kalshi unilaterally to terminate users' contracts and liquidate their positions, or to pause trading on these contracts pending the outcome of litigation months or more in the future.  *Id.* ¶ 29. Under either scenario, this would be an extraordinary and disruptive act.  Either scenario, moreover, would harm not just users in New Jersey, but nationwide, because shuttering access to users in one state would substantially distort the markets even for users in other states. Finally, the liquidation would impair existing contractual obligations amongst non-party Kalshi-users, constituting irreparable harm.  *See FTC v. Qualcomm, Inc.*, 935 F.3d 752, 756 (9th Cir. 2019) (requiring defendant to "renegotiate existing [contracts] on a large scale" is irreparable harm).

*Fourth*, no matter how Kalshi responds to the Division's unconstitutional threat, it will face irreparable reputational harm if no preliminary relief is granted.  If Kalshi chooses not to comply on the ground that New Jersey law is plainly preempted, the threat of prosecution—not to mention being labelled a willful violator of New Jersey law—would undermine the sterling reputation that Kalshi has cultivated over many years and that resulted in Kalshi being the first event market designated by the CFTC.  But bowing to the Division's threat by abruptly ending its business in New Jersey would yield exceptionally damaging corresponding harm.  It would undermine users' confidence in the Kalshi's exchange and make them fear that their own investments are at risk, particularly given the prospect of copycat enforcement in other states.

This loss of "goodwill" could not easily be regained even if Kalshi ultimately prevails, and constitutes a distinct form of irreparable harm. *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 726 (3d Cir. 2004); *see also Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir.1998).

*Fifth*, the Division's demands jeopardize Kalshi's status as a CFTC-designated contract market—and thus pose an existential threat to Kalshi. Abruptly terminating its sports-based contracts in New Jersey would be in considerable tension with the CFTC Core Principles to which Kalshi is subject, including the obligation to provide "impartial access" to its markets, 17 C.F.R. § 38.151(b), and the obligation to reduce the risk of "market disruptions," *id.* § 38.255. Kalshi is unaware of any precedent for a CFTC-designated exchange simply closing its business to residents of a particular state, and doing so would create enormous regulatory risk and uncertainty. Should the CFTC conclude that closing Kalshi's markets in New Jersey violates federal law, it could respond by seeking to revoke Kalshi's designation. 7 U.S.C. § 8(b). A TRO and preliminary injunction are needed to prevent Kalshi from suffering that irreparable harm during the pendency of this litigation.

### C. The Balance Of The Equities And Public Interest Favor A TRO And Preliminary Injunction.

 "[T]he enforcement of an unconstitutional law vindicates no public interest." *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013). "[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law." *ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003) (citation omitted). Indeed, it is quite the opposite: The public has a first-order interest in ensuring that preempted New Jersey laws are *not* enforced against federally-regulated entities. New Jersey retains no reciprocal interest because it lacks any interest in enforcing a state law that is preempted. *See Arizona*, 567 U.S. at 401.

Beyond that, "a Court must also consider possible harm to interested third parties." *LCN Enterprises, Inc. v. City of Asbury Park*, 197 F. Supp. 2d 141, 145 (D.N.J. 2002) (citing *Oburn v.*

*Shapp*, 521 F.2d 142, 152 (3d Cir. 1975)).  Immediate compliance with New Jersey law to avoid criminal penalties will harm Kalshi's users in New Jersey.  Winding down much of Kalshi's operations in New Jersey would impose intractable technological difficulties on a very short timeframe and would create significant risks for Kalshi's users.  Declaration of Xavier Sottile ¶¶ 12-28.  An abrupt cessation would make it difficult to inform users in New Jersey of their rights and obligations regarding ongoing event contracts, and would risk cutting off users' access to their investments on Kalshi's exchange.  Declaration of Xavier Sottile ¶¶ 29-37.  Given that the New Jersey laws are clearly preempted by federal law as applied to Kalshi, the balance of the equities and consideration of the public interest firmly favor a TRO and preliminary injunction.

**D.  No Security—Or Only A *De Minimis* Security—Is Appropriate.**

Fed. R. Civ. P. 65(c) requires a party seeking a TRO or preliminary injunction to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."   "The amount" of security required for an injunction under Rule 65(c) "is left to the discretion of the district court." *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988).

Defendants will suffer no nonspeculative damage by halting enforcement against Kalshi during the pendency of this litigation.  Accordingly, no security is needed.  *See Doctor's Associates, Inc. v. Stuart,* 85 F.3d 975, 985 (2d Cir.1996) (affirming decision not to require bond).  Alternatively, should the Court require a security, only a de minimis security is warranted.  Kalshi is prepared to obtain a security forthwith should the court deem one appropriate.

**CONCLUSION**

For the foregoing reasons, the Court should grant a preliminary injunction before April 7, 2025.  If the Court is unable to resolve Kalshi's request for a preliminary injunction by that date, the Court should enter a temporary restraining order before April 7, then grant a preliminary injunction thereafter.

Dated this 29th day of March, 2025.

/s/ Gurbir S. Grewal

Gurbir S. Grewal
Milbank LLP
55 Hudson Yards
New York, New York 10001
Telephone: 212-530-5775
Facsimile: 212-530-5775

Neal Kumar Katyal (pro hac vice pending)
Joshua B. Sterling (pro hac vice pending)
William E. Havemann (pro hac vice pending)
Milbank LLP
1850 K Street, Suite 1100
Washington D.C. 20006
Telephone: 202-835-7505
Facsimile: 213-629-5063

Mackenzie Austin (pro hac vice pending)
Milbank LLP
2029 Century Park East, 33rd Floor
Los Angeles, California 90067
Telephone: 424-386-4000
Facsimile: 213-629-5063

ATTORNEYS FOR PLAINTIFF