## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

KALSHIEX LLC,

    Plaintiff,

    v.

MARY JO FLAHERTY, *et al.*,

    Defendants.

Hon. Edward S. Kiel, U.S.D.J.
Hon. Matthew J. Skahill, U.S.M.J.

Docket No. 1:25-cv-2152-ESK-MJS

**CIVIL ACTION**

**(ELECTRONICALLY FILED)**

## DEFENDANTS' BRIEF IN OPPOSITION TO
## PLAINTIFF'S PRELIMINARY-INJUNCTION MOTION

Stephen Ehrlich
  *Deputy Solicitor General*

Emily M. Bisnauth
Liza B. Fleming
Patrick Jhoo
Vivek N. Mehta
  *Deputy Attorneys General*

**MATTHEW J. PLATKIN**
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 112
Trenton, New Jersey 08625
Phone: (609) 696-4772
Email: Liza.Fleming@njoag.gov
*Attorney for Defendants*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................... 1

COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY ... 3

    A.   New Jersey's Historical Regulation of Gambling ............................. 3

    B.   The Commodity Exchange Act ......................................................... 6

    C.   Kalshi's Business And This Case. ..................................................... 8

STANDARD OF REVIEW ...................................................................... 11

ARGUMENT ........................................................................................... 12

  I.   Kalshi will not succeed on the merits because the CEA does not preempt the New Jersey Sports Wagering Act ................................................ 12

    A.   The presumption against preemption applies to the New Jersey Sports Wagering Act. ..................................................................... 12

    B.   Congress did not field preempt state sports-wagering laws that regulate event contracts. ................................................................ 14

        1.   The CEA's plain text shows that Congress did not displace state sports-wagering laws that regulate event contracts. ............ 14

        2.   Nothing in the case law or legislative history of the CEA indicates that Congress meant to field preempt state sports-wagering laws regulating event contracts. ................................. 23

    C.   Regulation of these event contracts under New Jersey's Sports Wagering Act is not an obstacle to the purposes of the CEA ........... 26

        1.   The New Jersey Sports Wagering Act furthers rather than impedes the CEA ...................................................................... 27

        2. Kalshi does not identify any obstacle to the purposes and objectives of the CEA. ............................................................. 30

  II.  The equities confirm that Kalshi is not entitled to the relief it seeks. ..... 34

    A.   Kalshi has not established irreparable harm .................................... 34

    B.   The public interest weighs against injunctive relief. ........................ 38

CONCLUSION ....................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Freedom Holdings, Inc. v. Spitzer,*
  408 F.3d 112 (2d Cir. 2005) ........................................................ 38

*A.O. Smith Corp. v. FTC,*
  530 F.2d 515 (3d Cir. 1976) ........................................................ 38

*Abbott v. Perez,*
  585 U.S. 579 (2018) .................................................................... 39

*Abdullah v. Am. Airlines, Inc.,*
  181 F.3d 363 (3d Cir. 1999) ........................................................ 24

*Acierno v. New Castle County,*
  40 F.3d 645 (3d Cir. 1994) .............................................. 12, 35, 37

*Adams v. Freedom Forge Corp.,*
  204 F.3d 475 (3d Cir. 2000) ........................................................ 35

*Ah Sin v. Wittman,*
  198 U.S. 500 (1905) .................................................................... 13

*Am. Agric. Movement, Inc. v. Bd. of Trade,*
  977 F.2d 1147 (7th Cir. 1992)................................................19, 31

*Am. Apparel & Footwear Ass'n, Inc. v. Baden,*
  107 F.4th 934 (9th Cir. 2024) ...................................................... 22

*Am. Hosp. Ass'n v. Harris,*
  625 F.2d 1328 (7th Cir. 1980)...................................................... 38

*Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.,*
  39 F.4th 95 (3d Cir. 2022) ........................................................... 38

*Arizona v. United States,*
  567 U.S. 387 (2012) .................................................................... 23

*Artichoke Joe's Cal. Grand Casino v. Norton*,
   353 F.3d 712 (9th Cir. 2003) ...................................................................... 14

*Bartels v. Int'l Commodities Corp.*,
   435 F. Supp. 865 (D. Conn. 1977).............................................................. 25

*Bates v. Dow Agrosciences LLC*,
   544 U.S. 431 (2005) .................................................................................... 13

*Black United Fund of N.J., Inc. v. Kean*,
   763 F.2d 156 (3d Cir. 1985) ........................................................................ 37

*BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*,
   904 F.3d 755 (9th Cir. 2018) ...................................................................... 24

*Bruesewitz v. Wyeth, Inc.*,
   561 F.3d 233 (3d Cir. 2009) ........................................................................ 13

*California v. ARC Am. Corp.*,
   490 U.S. 93 (1989) ...................................................................................... 32

*Cantor v. Detroit Edison Co.*,
   428 U.S. 579 (1976) .................................................................................... 31

*Caplan v. Fellheimer Eichen Braverman & Kaskey*,
   68 F.3d 828 (3d Cir. 1995) .......................................................................... 36

*Casino Ventures v. Stewart*,
   183 F.3d 307 (4th Cir. 1999) ...................................................................... 40

*Cipollone v. Liggett Grp., Inc.*,
   505 U.S. 504 (1992) .................................................................................... 22

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) .................................................................................... 27

*CTS Corp. v. Dynamics Corp. of Am.*,
   481 U.S. 69 (1987) ...................................................................................... 29

*Davidson v. Sprout Foods, Inc.*,
   106 F.4th 842 (9th Cir. 2024) ...................................................................... 32

*Def. Distributed v. U.S. Dep't of State,*
   838 F.3d 451 (5th Cir. 2016) ...................................................... 39

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec'y,*
   108 F.4th 194 (3d Cir. 2024) ................................................12, 39

*Effex Capital, LLC v. Nat'l Futures Ass'n,*
   933 F.3d 882 (7th Cir. 2019) ...................................................... 19

*Ex Parte Young,*
   209 U.S. 123 (1908) ................................................................... 11

*Farina v. Nokia Inc.,*
   625 F.3d 97  (3d Cir. 2010) ................................................18, 23

*Freightliner Corp. v. Myrick,*
   514 U.S. 280 (1995) ................................................................... 22

*FTC v. Ken Roberts Co.,*
   276 F.3d 583 (D.C. Cir. 2001) ...........................................17, 24

*FTC v. Standard Oil Co. of Cal.,*
   449 U.S. 232 (1980) ................................................................... 36

*Greater New Orleans Broad. Ass'n, Inc. v. United States,*
   527 U.S. 173 (1999) ................................................................14, 39

*Green v. Fund Asset Mgmt., L.P.,*
   245 F.3d 214 (3d Cir. 2001) ...............................................29, 32

*Hawkeye Commodity Promotions, Inc. v. Vilsack,*
   486 F.3d 430 (8th Cir. 2007) ...................................................... 14

*Hofmayer v. Dean Witter & Co., Inc.,*
   459 F. Supp. 733 (N.D. Cal. 1978) ............................................ 25

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.,*
   959 F.3d 1201 (9th Cir. 2020)...............................................22, 31

*Int'l Paper Co. v. Ouellette,*
   479 U.S. 481 (1987) ................................................................... 18

*Int'l Trading Ltd. v. Bell*,
    556 S.W.2d 420 (Ark. 1977) ..................................................................... 25

*Johnson v. Collins Entm't Co., Inc.*,
    199 F.3d 710 (4th Cir. 1999) ................................................................... 14

*Jones v. B.C. Christopher & Co.*,
    466 F. Supp. 213 (D. Kan. 1979) ............................................................. 25

*Just Puppies, Inc. v. Brown*,
    123 F.4th 652 (4th Cir. 2024) ................................................................... 33

*Kalshiex, LLC v. Hendrick*,
    No. 2:25-CV-00575-APG-BNW, 2025 WL 1073495
    (D. Nev. Apr. 9, 2025) ............................................................................. 26

*Kansas v. Garcia*,
    589 U.S. 191 (2020) ....................................................................... passim

*Kerr v. First Commodity Corp.*,
    735 F.2d 281 (8th Cir. 1984) ................................................................... 19

*Klotz v. Celentano Stadtmauer & Walentowicz LLP*,
    991 F.3d 458 (3d Cir. 2021) ..................................................................... 12

*Knight v. City of Margate*,
    431 A.2d 833 (N.J. 1981) ........................................................................... 3

*Kugler v. Helfant*,
    421 U.S. 117 (1975) ................................................................................. 36

*Maryland v. King*,
    567 U.S. 1301 (2012) ............................................................................... 39

*MD Mall Assocs., LLC v. CSX Transp., Inc.*,
    715 F.3d 479 (3d Cir. 2013) .............................................................. 27, 34

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ................................................................................. 13

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
    456 U.S. 353 (1982) ................................................................................. 18

*Mims v. Arrow Fin. Servs., LLC*,
  565 U.S. 368 (2012) ............................................................... 25

*Minard Run Oil Co. v. U.S. Forest Serv.*,
  670 F.3d (3d Cir. 2011) ........................................................... 37

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992) ............................................................... 35

*Murphy v. NCAA*,
  584 U.S. 453 (2018) ..........................................................3, 4, 13

*Nken v. Holder*,
  556 U.S. 418 (2009) ..........................................................12, 38

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) ............................................................... 35

*Omnistone Corp. v. Cuomo*,
  485 F. Supp. 3d 365 (E.D.N.Y. 2020) ........................................ 37

*Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess*,
  297 F.3d 310, 323 (3d Cir. 2002) ............................................. 11

*Patry v. Rosenthal & Co.*,
  534 F. Supp. 545 (D. Kan. 1982)............................................... 19

*Pennsylvania v. Navient Corp.*,
  967 F.3d 273 (3d Cir. 2020) .................................................... 13

*Pinho v. Gonzales*,
  432 F.3d 193 (3d Cir. 2005) .................................................... 21

*Power v. Arlington Hosp. Ass'n*,
  42 F.3d 851 (4th Cir. 1994) .................................................... 19

*R. J. Hereley & Son Co. v. Stotler & Co.*,
  466 F. Supp. 345 (N.D. Ill. 1979) ............................................ 18

*R.J. Reynolds Tobacco Co. v. Durham County*,
  479 U.S. 130 (1986) ............................................................... 14

*Reilly v. City of Harrisburg*,
  858 F.3d 173 (3d Cir. 2017) ...............................................................12, 38

*Rice v. Norman Williams Co.*,
  458 U.S. 654 (1982) ........................................................................ 35

*Second City Music, Inc. v. City of Chicago*,
  333 F.3d 846 (7th Cir. 2003) ....................................................... 36

*Sherwin-Williams Co. v. County of Delaware*,
  968 F.3d 264 (3d Cir. 2020) ......................................................... 35

*Sikkelee v. Precision Airmotive Corp.*,
  822 F.3d 680 (3d Cir. 2016) ....................................................... 13, 14, 26

*Slaney v. The Int'l Amateur Athletic Fed'n*,
  244 F.3d 580 (7th Cir. 2001) ....................................................... 24

*Spectrum Ne., LLC v. Frey*,
  22 F.4th 287 (1st Cir. 2022)......................................................... 32

*Speiser v. Randall*,
  357 U.S. 513 (1958) ........................................................................ 21

*State v. Biden*,
  10 F.4th 538 (5th Cir. 2021) ....................................................... 36

*Strax v. Commodity Exch., Inc.*,
  524 F. Supp. 936 (S.D.N.Y. 1981) .............................................. 31

*Szehinskyj v. Att'y Gen.*,
  432 F.3d 253 (3d Cir. 2005) ....................................................... 25

*Taylor v. Bear Stearns & Co.*,
  572 F. Supp. 667 (N.D. Ga. 1983)............................................. 24

*United States v. Washington*,
  879 F.2d 1400 (6th Cir. 1989)...................................................... 14

*WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*,
  553 F.3d 292 (4th Cir. 2009) ....................................................... 13

*Wyeth v. Levine*,
  555 U.S. 555 (2009) ........................................................ 13, 31, 38

## Constitutional Provisions

N.J. Const. art. IV, § 7, ¶ 2 ............................................... 3, 4, 10, 11

U.S. Const. art. VI, cl. 2 ................................................................ 13

## Statutes

7 U.S.C. §§ 1–27f ........................................................................... 6

7 U.S.C. § 1a ......................................................... 7, 8, 15, 16, 17

7 U.S.C. § 2 ..................................................................... passim

7 U.S.C. § 5 .................................................................. 2, 6, 28, 29

7 U.S.C. § 6 ................................................................................ 16

7 U.S.C. § 7a-2 .......................................... 1, 8, 9, 17, 19, 20, 29, 30

7 U.S.C. § 16 ......................................................... 1, 21, 22, 23

18 U.S.C. § 1084(b) ...................................................................... 5

Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491 (1936) ............ 6

Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463,
  § 201, 88 Stat. 1389, 1395 (1974) ............................................. 6

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-
  203, § 722, 124 Stat. 1376, 1672 (2010) .................................... 7

N.J. Stat. Ann. §§ 5:12-1 to -233 ................................................... 3

N.J. Stat. Ann. § 5:12-1(b)(6) ....................................................... 3

N.J. Stat. Ann. § 5:12-55 ............................................................... 3

N.J. Stat. Ann. § 5:12-76 ......................................................... 6, 29

N.J. Stat. Ann. § 5:12-92 ............................................................... 5

N.J. Stat. Ann. § 5:12-95.22...................................................................... 5

N.J. Stat. Ann. § 5:12-104........................................................................ 4

N.J. Stat. Ann. § 5:12-145(c).................................................................. 40

N.J. Stat. Ann. § 5:12A-10.................................................................. 4, 6

N.J. Stat. Ann. § 5:12A-11..................................... 4, 5, 10, 11, 20, 28

N.J. Stat. Ann. § 5:12A-13(a)......................................................... 5, 28 39

N.J. Stat. Ann. § 5:12A-16.................................................................. 40

## Regulations

17 C.F.R. § 38.151(b) ...........................................................................33, 34

17 C.F.R. § 38.255 ...............................................................................33, 34

17 C.F.R. § 40.11 ..............................................................................8, 19, 29

N.J. Admin Code § 13:69O-1.2................................................................ 5, 39

N.J. Admin. Code § 13:69N-1.2 ........................................................5, 29, 39

## Other Authorities

Concept Release on the Appropriate Regulatory Treatment of Event Con-
    tracts, 73 Fed. Reg. 25,671 (May 7, 2008).................................................. 16

120 Cong. Rec. 30, 464 (Sept. 9, 1974) (statement of Senator Curtis),
    https://tinyurl.com/5n7nds2n................................................................ 26

156 Cong. Rec. S5902-01, S5907 (July 15, 2010)
    (statement of Senator Lincoln) ............................................................. 16

*Commodity Futures Trading Commission Act: Hearings Before the Senate Committee
    on Agriculture & Forestry*, 93d Cong., 2d Sess. 685 (1974)............................ 26

## PRELIMINARY STATEMENT

Like many other States, New Jersey has regulated gambling for over 125 years. Plaintiff KalshiEX, LLC thinks it is exempt from those laws simply because it offers sports wagers in a new format (called event contracts) on a market designated by the Commodity Futures Trading Commission (CFTC). Kalshi is wrong. There is no doubt that if the Commodity Exchange Act (CEA) applies to Kalshi's sports wagers, Kalshi must comply with the CEA in order to list them on a CFTC-designated market. But it cannot do so in violation of state law. New Jersey has exercised its historic police powers to protect the public from unsavory practices by regulating sports gambling in the State, and Kalshi cannot end-run that longstanding scheme just by offering sports wagers in a different format. The company's preliminary-injunction motion should be denied.

For starters, Kalshi cannot succeed on the merits of its claim that the CEA preempts New Jersey's Sports Wagering Act. As a threshold matter, Kalshi's event contracts do not fall under the CEA. But even if they did, it would not matter. The CEA references state law several times. It expressly preempts certain state laws; but not sports-related event contracts at issue here. 7 U.S.C. § 16. It also makes clear that nothing else in the CEA "supersede[s] or limit[s]" state law or the jurisdiction of state courts. *Id.* § 2(a)(1)(A). And perhaps most importantly, Congress specifically intended to prohibit event contracts that impermissibly involve, among other things, "gaming" or "activity that is unlawful under any Federal or State law." *Id.* § 7a-2(c)(5)(C)(i)(I), (V). Far from legislating "so comprehensively" that Congress "left no room for supplementary state

legislation," *Kansas v. Garcia*, 589 U.S. 191, 208 (2020), the CEA expressly parallels and incorporates state law. Unsurprisingly, then, New Jersey law furthers (rather than impedes) the CEA: both laws operate to "ensure the financial integrity of all transactions" and "to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets." 7 U.S.C. § 5(b).

Merits aside, Kalshi cannot prevail on the other preliminary-injunction factors. While Kalshi bemoans its inability to accept sports wagers in New Jersey if a preliminary injunction is denied, this harm is entirely avoidable: Kalshi can accept nearly all sports wagers in New Jersey if it simply obtains a license and complies with the Sports Wagering Act. And for the small subset of wagers that are prohibited under state law—college sporting events involving New Jersey colleges or taking place in New Jersey—Kalshi's alleged harm is both entirely speculative and purely monetary. So Kalshi will suffer no irreparable harm. But if Kalshi obtains injunctive relief, the public will suffer because New Jersey will be unable to both enforce its duly enacted sports-wagering laws that are meant to protect its residents and collect fees and taxes on these sports wagers, which are used to fund programs to treat gambling addiction and to provide services for senior citizens and New Jersey residents with disabilities.

This Court should reject Kalshi's invitation for any company to evade state sports-wagering laws by structuring their wagers as event contracts and self-certifying them with the CFTC. That result would severely erode States' longstanding police powers to regulate gambling within their borders.

## COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.    New Jersey's Historical Regulation of Gambling.

For over 125 years, New Jersey has regulated gambling within its borders. *See Murphy v. NCAA*, 584 U.S. 453, 458 (2018) (noting that in 1897, New Jersey banned all gambling by constitutional amendment). Gambling in New Jersey "is governed directly by the Constitution itself" as the State has long maintained that "[g]ambling is an activity rife with evil" and "mischief" affecting "the public welfare and morality." *Knight v. City of Margate*, 431 A.2d 833, 842 (N.J. 1981); *see* N.J. Const. art. IV, § 7, ¶ 2 (providing that gambling of any kind may only be legalized through ballot measure).

Many forms of gambling remained illegal in New Jersey until 1976, when residents voted to amend the New Jersey Constitution to allow gambling within Atlantic City. *Murphy*, 584 U.S. at 459; N.J. Const. art. IV, § 7, ¶ 2(D). The following year, the New Jersey Legislature implemented that constitutional amendment by enacting the Casino Control Act, N.J. Stat. Ann. §§ 5:12-1 to -233, which regulates casinos within Atlantic City. In doing so, the Legislature found that "the public confidence and trust in the credibility and integrity of the regulatory process and of casino operations" was "[a]n integral and essential element of the regulation and control of such casino facilities by the State." *Id.* § 5:12-1(b)(6). The Casino Control Act also created the New Jersey Division of Gaming Enforcement, *id.* § 5:12-55, and charged it with enforcing the Act and regulations promulgated under it, *id.* § 5:12-76(a).

3

In 2011, New Jerseyans again voted to amend the state Constitution to permit sports wagering, with one caveat, intended to protects students from the potentially harmful effects of sports betting: "wagering shall not be permitted on a college sport or athletic event that takes place in New Jersey or on a sport or athletic event in which any New Jersey college team participates regardless of where the event takes place." N.J. Const. art. IV, § 7, ¶ 2(D). The next major developments came just seven years later. In 2018, the Supreme Court in *Murphy*, held that a federal law prohibiting the state authorization of sports wagering violated the U.S. Constitution and observed that Congress had not elected to directly regulate sports wagering. 584 U.S. at 486. The New Jersey Legislature then swiftly enacted the Sports Wagering Act, N.J. Stat. Ann. §§ 5:12A-10 to -19. Under the Act, casinos and racetracks may obtain sports wagering licenses to "operate a sports pool" in accordance with the Act and its regulations. *Id.* § 5:12A-11(a). A "sports pool" is defined as "the business of accepting wagers on any sports event by any system or method of wagering," including "exchange wagering." *Id.* § 5:12A-10. And the holder of a sports wagering license "may authorize an internet sports pool operator" to "operate an online sports pool on its behalf provided the terms of the agreement are approved by the [D]ivision [of Gaming Enforcement]." *Id.* § 5:12A-11(a); *see also* N.J. Stat. Ann. § 5:12-104(a)(12), (13). Conversely, "[n]o sports pool or online sports pool shall be offered or made available for wagering to the public by any entity other than a sports wagering licensee" or "an Internet sports pool operator, on behalf of a sports wagering licensee." *Id.* § 5:12A-11(c).

4

Sports wagering licensees and operators must comply with New Jersey's statutory and constitutional requirements. *See, e.g.*, *id.* §§ 5:12A-10 to -11, -13(a) (listing requirements that operators must abide by to receive or maintain a license); N.J. Admin Code § 13:69O-1.2 (providing general requirements for internet and mobile gaming). Statutory requirements include that operators must place their servers in Atlantic City or at a New Jersey racetrack to and implement certain technical requirements and consumer protection safeguards. *See* N.J. Stat. Ann. §§ 5:12A-11(a); 5:12-95.22.[1] An operator also must provide documentation to the Division reflecting "its financial background and resources, including cash reserves, that are sufficient to demonstrate that it has the financial stability, integrity, and responsibility to operate a sports pool or online sports pool." *Id.* § 5:12A-13(a); *see id.* § 5:12-92(a)–(b). A sports-pool operator must also abide by regulations, including "maintain[ing] a cash reserve of an amount necessary to ensure the ability to cover both the outstanding unpaid winning sport pool wagers and the outstanding sport pool wagers where the outcome has not been determined." N.J. Admin. Code § 13:69N-1.2(d). And an online sports-pool operator must "only accept wagers from patrons that have been affirmatively located as being physically present in the State of New Jersey at the time of their wager." *Id.* § 13:69N-1.2(g). Internet or mobile gaming systems are required to employ certain security measures like a geolocation system, age restrictions, and others. *See id.* § 13:69O-1.2.

---

[1] Kalshi's sports event contracts also likely violate the Wire Act, 18 U.S.C. § 1084(b), which requires sports wagers to be placed only in States where legal.

Operators also must comply with the constitutional mandate prohibiting sports wagers on a college sports events taking place in New Jersey or in which a New Jersey college team participates. N.J. Stat. Ann. § 5:12A-10. The Division conducts investigations, audits, and enforcement actions to protect the public by ensuring that operators follow the law. *See id.* § 5:12-76.

**B.    The Commodity Exchange Act.**

Federal regulation of the derivatives market is, by comparison, a more recent development. In 1936, Congress enacted the CEA, which delegated certain regulatory responsibilities for commodities trading to the Attorney General and the Secretaries of Agriculture and Commerce. *See* Pub. L. No. 74-675, 49 Stat. 1491 (1936) (codified as amended at 7 U.S.C. §§ 1–27f). In so doing, Congress sought to establish a regulatory framework for commodities contracts to "manag[e] and assum[e] price risk," 7 U.S.C. § 5(a), to "deter and prevent price manipulation," "ensure the financial integrity of all transactions," and protect "all market participants from fraudulent or other abusive sales practices" through "a system of effective self-regulation," *id.* § 5 (b).

In 1974, the CEA was amended to create the CFTC and grant it exclusive jurisdiction over transactions regulated by the CEA. Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, § 201, 88 Stat. 1389, 1395 (1974). The Dodd-Frank Wall Street Reform and Consumer Protection Act amended the CEA again in 2010 to give the Securities Exchange Commission exclusive jurisdiction over security-based swaps and the CFTC exclusive jurisdiction over all other swaps. Pub. L. 111-203, § 722, 124 Stat. 1376, 1672 (2010).

In its current form, the CEA grants the CFTC "exclusive jurisdiction …
with respect to accounts, agreements …, and transactions involving swaps or
contracts of sale of a commodity for future delivery" that are "traded or executed
on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A). The CEA
defines "swaps" to include "any agreement, contract, or transaction … that pro-
vides for any purchase, sale, payment, or delivery … that is dependent on the
occurrence, nonoccurrence, or the extent of the occurrence of an event or con-
tingency associated with a potential financial, economic, or commercial conse-
quence." *Id.* § 1a(47)(A)(ii). That exclusive-jurisdiction provision includes two
savings clauses. The regulatory savings clause provides: "Except as [provided in
the exclusive-jurisdiction provision], nothing contained in this section shall (I)
supersede or limit the jurisdiction at any time conferred … under the laws of …
any State, or (II) restrict … such other authorities from carrying out their duties
and responsibilities in accordance with such laws." *Id.* § 2(a)(1)(A). And the ju-
risdictional savings clause provides: "Nothing in this section shall supersede or
limit the jurisdiction conferred on courts of the United States or any State." *Id.*

In order to offer a derivative contract for public trading, an entity must
receive the CFTC's designation as a contract market. *Id.* §§ 2(e), 7(a). Once an
entity is designated by the CFTC as a contract market, it may list new contracts
on its exchanges without pre-approval by the CFTC by providing the CFTC "a
written certification that the new contract" complies with the CEA. *Id.* § 7a-
2(c)(1). The contract then becomes "effective" unless the CFTC notifies the con-
tract market within ten business days that it is staying the certification in order

7

to review the submission. *Id.* § 7a-2(c)(2). As relevant to the event contracts here, the CFTC must take final action on whether to prohibit such contracts within "90 days from the commencement of its review." *Id.* § 7a-2(c)(5)(C)(iv).

The CEA also contains a "[s]pecial rule for review and approval of event contracts," which provides: The CFTC "may determine" that "agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency … , by a designated contract market … are contrary to the public interest" and therefore prohibited if "the agreements, contracts, or transactions involve," among other things, "gaming" or "activity that is unlawful under any Federal or State law." *Id.* § 7a-2(c)(5)(C); *see* 17 C.F.R. § 40.11(a)(1). The definition of an "excluded commodity" (like the definition of "swap") includes "an occurrence, extent of an occurrence, or contingency ... that is (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv).

## C.    Kalshi's Business And This Case.

Kalshi is certified by the CFTC as a designated contract market and operates a derivatives exchange and prediction market where users can buy and sell derivatives contracts known as "event contracts." ECF No. 1 (Compl.) ¶¶ 12, 37. The event contracts identify a future event and propose a binary yes/no question regarding whether that future event will occur. *Id.* ¶ 20. Event contracts are traded on an exchange, and traders exchange positions with other traders in the marketplace. *Id.* ¶ 21. A trader may purchase either the "yes" or "no" position

8

of the event occurring. *Id.* ¶ 20. If the purchaser has chosen the "yes" position, and the event occurs, then the purchaser is paid out. *Id.* The payout depends on market perceptions about the likelihood of the event's occurrence and accordingly fluctuates between the time of its creation and the expiration date. *Id.* ¶ 22. The ultimate value of the outcome is determined at the contract's expiration date. *Id.* For example, an event contract may ask whether an earthquake will occur in Los Angeles County before December 31, 2025. *Id.* ¶ 20. If an earthquake does occur before that date, then the purchaser of the "yes" position is entitled to its full value. *Id.* Among many other substantive areas, Kalshi recently began offering event contracts on the outcome of sports events. *Id.* ¶ 40.

On January 24, 2025, Kalshi self-certified and then began offering event contracts related to the outcome of sports events on its exchange, under the guise of compliance with the CEA. *Id.* ¶ 41. These sports-related event contracts allow users to place positions on the outcome of sports events like which teams will advance in certain rounds of the NCAA College Basketball Championship. *Id.* Although the CFTC may review and prohibit event contracts involving "gaming" or "activity that is unlawful under any Federal or State law," 7 U.S.C. § 7a-2(c)(5)(C)(i)(I), (V), the CFTC has not yet taken action to review or prohibit Kalshi's sports-related event contracts, Compl. ¶ 41.

On March 27, 2025, after Kalshi began offering its sports-related event contracts, the New Jersey Division of Gaming Enforcement issued a cease and desist letter to Kalshi. Compl., Ex. 1. The Division notified Kalshi that it was offering unauthorized sports wagers to individuals located within New Jersey in

violation of the Sports Wagering Act, N.J. Stat. 5:12A-11, "which only permits licensed entities to offer sports wagering to patrons located in New Jersey," *id.* The Division also informed Kalshi that it was offering unauthorized sports wagering to New Jersey residents on collegiate sporting events occurring in New Jersey in violation of the New Jersey Constitution's prohibition on such wagers. *Id.* (citing N.J. Const. art. IV, § 7, ¶ 2(D)). Because Kalshi's acceptance of unauthorized sports wagering from individuals violated New Jersey law, the Division demanded that Kalshi "immediately cease and desist from offering any form of sports wagering to New Jersey residents and void any such wagers already placed" and confirm its compliance by March 28, 2025. *Id.*

Kalshi and representatives of the Division of Gaming Enforcement engaged in discussions on March 27 and 28, but the parties were unable to come to a resolution, and Kalshi informed the Division of its intent to sue and seek preliminary injunctive relief. ECF No. 2 (PI Br.) at 11. The Division then agreed to extend the compliance deadline until April 7, 2025. *Id.*

On March 29, 2025, Kalshi filed a Complaint and a motion for a preliminary injunction against Mary Jo Flaherty, Interim Director of the Division of Gaming Enforcement; the Division of Gaming Enforcement; James T. Plousis, Chairman of the Casino Control Commission; Alisa Cooper, Vice Chair of the Casino Control Commission; Joyce Mollinaeux, Commissioner of the Casino

Control Commission; the Casino Control Commission; and Matthew J. Platkin, Attorney General of New Jersey.[2] Compl. ¶¶ 13–19.

Kalshi alleges that the CEA preempts the New Jersey Sports Wagering Act and N.J. Const. art. IV, § 7, ¶ 2(D) because the CEA occupies the entire field of trading on CFTC- regulated markets and because New Jersey law would frustrate the CFTC's exclusive authority to regulate designated exchanges. Compl. ¶¶ 59–60. Kalshi asks this Court to preliminarily enjoin Defendants from enforcing "N.J. Stat. 5:12A-11, N.J. Const. art. IV, § 7, ¶ 2(D), and any other New Jersey law that attempts to effectively regulate [Kalshi]'s futures market." Compl. at 15–16. Thereafter, the Division of Gaming Enforcement agreed to further extend Kalshi's compliance deadline until April 30, 2025, ECF No. 6, and this Court granted the parties' proposed briefing schedule on the preliminary injunction motion in accordance with that extended deadline, ECF No. 9.

## STANDARD OF REVIEW

Injunctive relief "is an extraordinary remedy that should be granted only in limited circumstances." *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety &*

---

[2] The Division of Gaming Enforcement, the Casino Control Commission, the members of the Casino Control Commission, and the Attorney General are not proper parties to this suit. Claims against state agencies are barred by sovereign immunity. *See Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 323 (3d Cir. 2002) ("state agencies and departments … when the state is the real party in interest" are "generally immune from suit by private parties in federal court"). Members of the Casino Control Commission, and perhaps the Attorney General, are not proper parties because they do not enforce the Sports Wagering Act. *See Ex Parte Young*, 209 U.S. 123, 157 (1908) (an official is properly named if the official "by virtue of his office has some connection with the enforcement of the act"). Defendants will seek dismissal of these parties at the appropriate time.

*Homeland Sec.*, 108 F.4th 194, 200 (3d Cir. 2024) (cleaned up). The "primary purpose of a preliminary injunction is maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle County*, 40 F.3d 645, 647 (3d Cir. 1994). To obtain relief, the movant must first "meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits" and "that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). "If these gateway factors are met, a court then considers the remaining two factors"—the balance of equities and public interest—"and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id*. Where the State is a defendant, the last two factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.    Kalshi will not succeed on the merits because the CEA does not preempt the New Jersey Sports Wagering Act.

"Federal law can preempt state law in three ways: (1) express preemption; (2) field preemption; or (3) conflict preemption." *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 463 (3d Cir. 2021) (footnote omitted). Kalshi presses only the latter two theories: field and conflict preemption. Both fail.

#### A.    The presumption against preemption applies to the New Jersey Sports Wagering Act.

While federal law is the "supreme Law of the Land," U.S. Const. art. VI, cl. 2, Kalshi must clear a high bar from the outset: "all preemption cases 'start with the assumption that the historic police powers of the States were not to be

12

superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 687 (3d Cir. 2016) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). Applying even this baseline presumption, courts must disfavor preemption when faced with two plausible readings of a statute. *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005); *see also Bruesewitz v. Wyeth, Inc.*, 561 F.3d 233, 240 (3d Cir. 2009). But this presumption is even stronger when Congress has legislated "in a field which the States have traditionally occupied." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *Pennsylvania v. Navient Corp.*, 967 F.3d 273, 288 (3d Cir. 2020) (same).

Regulation of gambling is exactly such a field. States have long regulated gambling in this country. *See Murphy*, 584 U.S. at 458–9. That is unsurprising because regulation of gambling is undoubtedly at the core of a State's traditional police powers. *See Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905) ("The suppression of gambling is concededly within the police powers of a state."); *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 302 (4th Cir. 2009) ("[R]egulating gambling is at the core of the state's residual powers as a sovereign in our constitutional scheme."); *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 439 (8th Cir. 2007) ("A state's police power encompasses controlling gambling."); *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003) (noting "the regulation of gambling lies at the heart of the state's police power"); *Johnson v. Collins Entm't Co., Inc.*, 199 F.3d 710, 720 (4th Cir. 1999) (same); *United States v. Washington*, 879 F.2d 1400, 1401 (6th Cir. 1989) (similar). The reason for this is obvious: gambling is a potentially harmful

13

"vice activity," and States have an interest in reducing "the social costs associated with" it, *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 185 (1999), to promote the "welfare, safety, and morals" of their citizens, *Artichoke Joe's Cal. Grand Casino*, 353 F.3d at 737.

The Sports Wagering Act therefore lies at the heart of New Jersey's traditional police powers and Kalshi bears a heavy burden to demonstrate that it is preempted. But, as discussed below, it cannot bear that burden.

**B.    Congress did not field preempt state sports-wagering laws that regulate event contracts.**

Field preemption applies only "[i]n rare cases," where "Congress 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation.'" *Kansas*, 589 U.S. at 208 (quoting *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140 (1986)). In assessing field preemption, courts must avoid "interpreting the scope of the preempted field too broadly." *Sikkelee*, 822 F.3d at 689. Here, the text of the CEA establishes that Congress did not intend to occupy the field of state law regulating event contracts, and nothing in the case law or legislative history indicates otherwise.

### 1.    *The CEA's plain text shows that Congress did not displace state sports-wagering laws that regulate event contracts.*

The text of the CEA makes clear that Congress did not intend to preempt the field of regulation of derivatives trading on CFTC-regulated exchanges.

Start with the provision on which Kalshi bases its field preemption claim: the exclusive-jurisdiction provision. 7 U.S.C. § 2(a)(1)(A). That provision gives the CFTC "exclusive jurisdiction" over "accounts, agreements …, and

14

transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC "or any other board of trade, exchange, or market." *Id.* Kalshi claims this provision gives the CFTC exclusive jurisdiction over its event contracts because they are "swaps," *id.* § 1a(47)(A)(ii), and Kalshi is a CFTC-designated contract market. PI Br. 5–6, 14. And, Kalshi argues, Congress's grant of exclusive jurisdiction to the CFTC to regulate event contracts means Congress intended to preempt the field of all state laws that affect event contracts. PI Br. 14–18.

This theory suffers from various flaws. To begin, the exclusive-jurisdiction provision does not even cover the transactions at issue. Kalshi's theory hinges on the idea that event contracts are "swaps" within the exclusive jurisdiction of the CFTC. PI Br. 5–6. But a "swap" is limited to "any agreement, contract, or transaction" that "provides for any purchase, sale, payment, or delivery" that "is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated *with a potential financial, economic, or commercial consequence*." 7 U.S.C. § 1a(47)(A)(ii) (emphasis added). This definition was meant to cover run-of-the-mill transactions in the heartland of the CFTC's authority, like swaps pertaining to a specific farmer's crop yield or changes in corporate asset purchases. *See* Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25,671 (May 7, 2008).

Yet the transactions here concern event contracts related to sports games, which are not associated with a "potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Kalshi doesn't seem to think so either.

15

In its brief to the D.C. Circuit, Kalshi explained that "contracts relating to *games*—again, activities conducted for diversion or amusement—are unlikely to serve any 'commercial or hedging interest.'" Appellee's Br. at 45, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024). The legislative history of the 2010 amendment, which added "swaps" to the CFTC's jurisdiction, explains why: "It would be quite easy to construct an 'event contract' around sporting events." Indeed, "[t]hese types of contracts would not serve any real commercial purpose," but instead "would be used solely for gambling." 156 Cong. Rec. S5902-01, S5907 (July 15, 2010) (statement of Senator Lincoln).

If event contracts not associated with a "potential financial, economic, or commercial consequence" were considered to be "swaps," then *any* wager placed on the outcome of an event—including raffles and other games of chance—would also be considered swaps. And any casino offering sports wagers would be violating the CEA because it would be offering swaps outside of a CFTC-designated exchange on "any other board of trade, exchange, or market." *See* 7 U.S.C. §§ 2(e), 6(a)(1). In that vein, because the exclusive-jurisdiction provision applies to swaps outside of a CFTC-designated exchange (on "any other board of trade, exchange, or market"), Kalshi's limitless definition of a "swap" would mean that the CFTC's exclusive jurisdiction covers—and precludes States from regulating—large swaths of state law. That is not what Congress

intended. Kalshi's sports-related event contracts are not "swaps" and therefore do not fall within the CFTC's "exclusive jurisdiction" in the first place.[3]

And where a particular transaction—like Kalshi's sports-related event contracts—does not fall within the CFTC's exclusive jurisdiction, the CEA expressly preserves state law: "Except as [provided in the exclusive-jurisdiction provision], nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred … under the laws of … any State, or (II) restrict … such other authorities from carrying out their duties and responsibilities in accordance with such laws." 7 U.S.C. § 2(a)(1)(A). As courts have recognized, this clause "makes clear that other agencies" still "retain their jurisdiction over all matters beyond the confines of" the exclusive-jurisdiction provision. *FTC v. Ken Roberts Co.*, 276 F.3d 583, 591 (D.C. Cir. 2001).

Even assuming Kalshi's sports-related event contracts fall under the exclusive-jurisdiction provision, neither the purpose nor the text of the CEA shows that Congress intended to regulate so comprehensively in the field of event contracts as to leave no room for supplementary state regulation.

To start, Kalshi relies primarily on the exclusive-jurisdiction provision for its field preemption claim, but the purpose and text undermine such a theory.

---

[3] Kalshi faces the same problem under the special rule that the CFTC applies to determine whether event contracts are prohibited. 7 U.S.C. § 7a-2(c)(5)(C). The special rule applies to "swaps in excluded commodities" and "excluded commodities" are again defined as, among other things, "an occurrence, extent of an occurrence, or contingency" that is "associated with a financial, commercial, or economic consequence." *See id.*; *id.* § 1a(19). Again, athletic events are not of "a financial, commercial, or economic consequence." *Id.*

The Supreme Court has explained that this exclusive-jurisdiction provision was "intended only to consolidate federal regulation of commodity futures trading in the Commission" and to "separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386–87 (1982). That is, its purpose was merely "to remedy the confusion about whether certain types of commodities transactions came within the definition of a security and thus subject to regulation under the securities laws." *R. J. Hereley & Son Co. v. Stotler & Co.*, 466 F. Supp. 345, 347 (N.D. Ill. 1979). But this provision evinces no intent to preempt the entire field of all derivatives trading regulation.

Other language in the exclusive-jurisdiction provision confirms that it does not occupy the field of derivatives trading to the exclusion of state law. For instance, in the preservation of state-court jurisdiction in the savings clause, Congress made clear: "Nothing in this section shall supersede or limit the jurisdiction conferred on courts" of "any State." 7 U.S.C. § 2(a)(1)(A). A savings clause generally "negates the inference that Congress left no room for state causes of action." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987); *Farina v. Nokia Inc.*, 625 F.3d 97, 121 (3d Cir. 2010). Courts interpreting this clause agree: Congress "did not manifest an intent to occupy completely the entire field of commodity futures regulation." *See, e.g.*, *Effex Capital, LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019); *Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1155 (7th Cir. 1992) (holding this "savings clause" is "designed to preserve in the futures trading context at least some state law causes of actions");

*accord Kerr v. First Commodity Corp.*, 735 F.2d 281, 288 (8th Cir. 1984). In fact, the savings clause was added to allay fears that the exclusive-jurisdiction provision "might oust the courts' jurisdiction over typical state law claims." *Patry v. Rosenthal & Co.*, 534 F. Supp. 545, 548–49 (D. Kan. 1982). In other words, the CFTC's exclusive jurisdiction was meant to be "exclusive" as to other federal agencies, not state-law regulations and claims.

Two other provisions of the CEA also confirm that Congress did not legislate so comprehensively as to leave no room for state law. The CEA's special rule for review of event contracts provides that the CEA "may determine" that "agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency" are "contrary to the public interest" and therefore prohibited if they involve "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C)(i); *see also* 17 C.F.R. § 40.11(a). As this statutory text makes abundantly clear, Congress expressly *incorporated* state law into the determination of whether an event contract should be prohibited. And where "a federal statute expressly incorporates state law," it makes sense that a "preemption analysis is inappropriate." *Cf. Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 864 (4th Cir. 1994). Congress obviously leaves "room for supplementary state legislation" where it expressly relies on and incorporates that state legislation. *Kansas*, 589 U.S. at 208.

The CFTC's own interpretation of the special rule bolsters this conclusion. In litigation over Kalshi's election-gambling event contracts, the CFTC explained that the CEA does not preempt state election-gambling laws: the

CFTC's "[e]xclusive federal jurisdiction over exchange-traded derivatives does not mean such state interests must give way to [an entity's] desire to run an election gambling operation on a regulated exchange, thereby circumventing well-founded state laws designed to protect the democratic process." CFTC's Br. at 54–55, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024). Put simply, "the CEA should not be an escape hatch from state law interests." *Id.* at 53. It would turn "the [CFTC]'s task of evaluating contracts and transactions on its head" to say that the CEA preempts the entire field of derivatives trading; then *no* election-related event contract could involve conduct that is unlawful under state law. *Id.* at 54.

The same reasoning applies to sports-wagering laws here. Only a sports-wagering licensee or its operator—authorized to offer sports betting under the Sports Wagering Act—may offer sports wagers in New Jersey. N.J. Stat. Ann. § 5:12A-11(c). Because Kalshi is offering event contracts involving sports wagers in New Jersey without obtaining proper authorization, Kalshi's event contracts involve an "activity that is unlawful" under New Jersey law. 7 U.S.C. § 7a-2(c)(5)(C)(i)(I). Far from being preempted by the CEA's special rule, that provision's reliance on state law demonstrates exactly the opposite: Congress *wanted* state laws to apply when those laws affect event contracts. Otherwise the special rule's prohibition on event contracts involving "activity that is unlawful" under "State law" would never apply.

To be sure, the CFTC may examine whether an activity is unlawful under state law in determining whether to allow the listing of event contracts on

designated contract markets. *See id.* But that does not mean the CFTC is the *only* regulatory authority responsible for doing so. The CFTC does not have expertise in interpreting state laws. That's why *state* regulatory authorities are simultaneously responsible for applying their own state laws. To hold otherwise would make the CFTC—a federal agency responsible for regulating U.S. derivatives markets—the final arbiter of state laws ranging from election law to sports wagering in more than 50 jurisdictions covering 340 million people. That would be bizarre; even federal *courts* do not authoritatively interpret state law. *See Pinho v. Gonzales*, 432 F.3d 193, 212 (3d Cir. 2005); *Speiser v. Randall*, 357 U.S. 513, 522 n.7 (1958) (noting it is a "basic constitutional principle that the construction of state laws is the exclusive responsibility of the state courts"). And Congress's incorporation of state law into the special rule was plainly meant to parallel, not usurp, the States' enforcement of their own laws.

This is reinforced by Congress's decision not to include state gaming laws affecting event contracts in the CEA's two express-preemption provisions. *See* 7 U.S.C. § 16. One provision says that the CEA "supersede[s] and preempt[s] the application of any" state law "that prohibits or regulates gaming" for certain exempt or excluded transactions—but not for event contracts on a designated contract market, as Kalshi's are here. *Id.* § 16(e)(2). Similarly, another express-preemption provision makes clear that, to the extent insurance laws can be construed as applying to swaps, those laws are expressly preempted. *Id.* § 16(h).

Congress's decision to expressly preempt state gaming laws for certain transactions and state-insurance laws for swaps—and silence as to all others—is

21

strong evidence that Congress did not intend to regulate so comprehensively as to exclude all state law. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992) ("Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted."); *Am. Apparel & Footwear Ass'n, Inc. v. Baden*, 107 F.4th 934, 943 (9th Cir. 2024) (same). Had Congress intended to preempt all state gambling laws—which have long existed within States' historic police powers—it certainly could have done so. *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1220 (9th Cir. 2020) ("Congress's 'certain awareness of the prevalence of state' law, coupled with its 'silence on the issue,' 'is powerful evidence that Congress did not intend' to preempt [those state] laws." (quoting *Wyeth*, 555 U.S. at 575)). The absence of such an express-preemption provision is telling.[4]

All these provisions prove that Congress did not legislate "so comprehensively" that "it left no room for supplementary state legislation." *Kansas*, 589 U.S. at 208. No doubt, there is a federal regulatory framework governing the procedural requirements for event contacts to be listed on CFTC-designated

---

[4] Kalshi relies on the CEA's preservation of concurrent state jurisdiction over entities that are "required to be registered or designated" with the CFTC but "fail or refuse" to do so, 7 U.S.C. § 16(e)(1)(C), to highlight the absence of such preservation for contracts traded on CFTC-approved exchanges. PI Br. 14. That argument is misplaced. Kalshi's claim to CEA jurisdiction is based on its characterization of event contracts as "swaps." Compl. ¶ 20; PI Br. 6. But the concurrent-jurisdiction provision does not apply to swaps. *See* 7 U.S.C. § 2(d) (noting that, aside from specific provisions not including § 16(e)(1)(C), the CEA does not apply to swaps). So this provision is irrelevant to Kalshi's event contracts.

markets. *See* PI Br. at 16–17. But Kalshi cites no federal provision that regulates the *types* of event contracts that may be listed on CFTC-designated markets—other that the special rule itself, which (as discussed above) expressly incorporates state law. *Compare id.*, *with supra* at 19–21. Instead, the company's argument essentially boils down to the words "exclusive jurisdiction" in the exclusive-jurisdiction provision. *See* PI Br. at 13, 14–17. The Third Circuit has rejected similar arguments before. *See Farina*, 625 F.3d at 121 (no field preemption despite "Congress's delegation of 'exclusive authority'" over radio-frequency-emission regulation). And this Court should reject it again.

Regardless, two words are hardly a "comprehensive" scheme. By contrast, where courts find that the federal government has occupied a field, the statutory framework is comprehensive and "reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona v. United States*, 567 U.S. 387, 401–02 (2012) (field of alien registration); *see also, e.g.*, *Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 368–72 (3d Cir. 1999) (field of aviation safety). Where, as here, federal law contains savings clauses preserving state law, references state law in determining eligibility of certain transactions, and expressly preempts some (but not all) state law, Congress plainly intended to account for—and not to foreclose—state legislation.

### 2. *Nothing in the case law or legislative history of the CEA indicates that Congress meant to field preempt state sports-wagering laws regulating event contracts.*

Kalshi's contrary arguments do not support field preemption. The company relies on two cases for its broad interpretation of "exclusive jurisdiction,"

but neither concerns field preemption. *See Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 594–96 (7th Cir. 2001) (conflict preemption for U.S. Olympic Committee's "exclusive jurisdiction" over eligibility determinations); *BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 765–66 (9th Cir. 2018) (conflict preemption for "exclusive" jurisdiction provision that preempted state and local regulation of rail activity, but not other laws of general applicability).

And Kalshi's cases interpreting the CEA do not support field preemption. PI Br. 16. Each merely establishes that the CEA gives the CFTC—as opposed to other agencies like the SEC—exclusive jurisdiction over the trading of derivative contracts on designated contract markets. And each predates the 2010 amendment to add "swaps" to the exclusive-jurisdiction provision. *See Ken Roberts Co.*, 276 F.3d at 588 (exclusive-jurisdiction provision was meant to avoid duplicative regulation, especially between SEC and CFTC); *Taylor v. Bear Stearns & Co.*, 572 F. Supp. 667, 674 (N.D. Ga. 1983) ("state statutes that entail administrative agency involvement … might conflict with the CFTC's regulatory role"); *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 219 (D. Kan. 1979) (describing "spat between the CFTC and SEC concerning the frontiers of their respective jurisdictions" as basis for CFTC exclusive jurisdiction)); *Hofmayer v. Dean Witter & Co., Inc.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978) (exclusive-jurisdiction provision preempted federal or state securities law for commodity futures); *Bartels v. Int'l Commodities Corp.*, 435 F. Supp. 865, 868–69 (D. Conn. 1977) (CFTC exclusive jurisdiction stemmed from Congress's dissatisfaction with commodities regulation under existing securities laws); *Int'l Trading Ltd. v.*

*Bell*, 556 S.W.2d 420, 423–25 (Ark. 1977) (CEA preempted Arkansas Securities Act). Kalshi cites no case holding that Congress occupied the entire field of derivatives trading on CFTC-regulated exchanges to the exclusion of state law.

Kalshi's cited legislative history does not help its argument either. *See* PI Br. 15. Initially, Kalshi's reliance on the statements of individual legislators does not provide strong evidence of legislative intent. Courts generally do not rely on remarks of individual legislators—even bill sponsors—to ascertain congressional intent. *See, e.g.*, *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 385 (2012) ("the views of a single legislator, even a bill's sponsor, are not controlling"); *Szehinskyj v. Att'y Gen.*, 432 F.3d 253, 256 (3d Cir. 2005) (It is a "well-known admonition that what individual legislators say a statute will do, and what the language of the statute provides, may be far apart indeed."). In any event, those statements do not support the broad preemption Kalshi seeks. For instance, Senator Curtis noted that the CEA would only preempt state law if it "were contrary to or inconsistent with Federal law"—a different standard from field preemption. *See* 120 Cong. Rec. 30, 464 (Sept. 9, 1974) (statement of Senator Curtis), https://tinyurl.com/5n7nds2n. And while Senator Clark argued that "different state laws would just lead to total chaos," his statement was in reference to a hypothetical Nevada law prohibiting trading in futures markets in direct conflict of federal law. *See Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry*, 93d Cong., 2d Sess. 685 (1974). Neither statement proves that Congress intended, much less had the "clear and manifest" intent,

to supersede generally applicable laws within a state's historic police powers, like the New Jersey Sports Wagering Act. *See Sikkelee*, 822 F.3d at 687.

The recent decision from the District of Nevada in *KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 1073495 (D. Nev. Apr. 9, 2025), does not change this conclusion. There, the court preliminarily enjoined Nevada from enforcing its election-gambling and sports-gambling laws against Kalshi. *Id.* at *8. The court held that the CEA preempted Nevada's laws because the exclusive-jurisdiction provision "reflects congressional intent to occupy the field of regulating CFTC-designated exchanges and the transactions conducted on those exchanges." *Id.* at *6. But the court failed to consider various CEA provisions in any depth, including (1) the threshold inapplicability of the exclusive-jurisdiction provision, *see supra* at 15–17; (2) the savings clauses, *see supra* at 18–19; (3) the special rule's reference to state law, *see supra* at 19–21; and (4) the CEA's narrow express-preemption provisions that do not cover Kalshi sports-related event contracts, *see supra* at 21–22. In effect, the court ruled that event contracts are immune from any state law—tax laws, disclosure laws, and others. But Congress never intended such sweeping immunity. This Court should instead hold that Kalshi is unlikely to succeed on its field-preemption claim.

## C. Regulation of these event contracts under New Jersey's Sports Wagering Act is not an obstacle to the purposes of the CEA.

Kalshi's conflict-preemption claim is even weaker. Conflict preemption arises only "where it is impossible for a private party to comply with both state and federal law, or where under the circumstances of a particular case, the

challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *MD Mall Assocs., LLC v. CSX Transp., Inc.*, 715 F.3d 479, 495 (3d Cir. 2013) (citation omitted). "The mere fact of 'tension' between federal and state law," on the other hand, "is generally not enough to establish an obstacle supporting preemption." *Id.* Whether conflict preemption applies "is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). Here, everyone agrees that it is not "impossible" for Kalshi "to comply with both state and federal law." *MD Mall Assocs., LLC*, 715 F.3d at 495. Rather, Kalshi argues that New Jersey's Sports Wagering Act stands as an obstacle to the intended purpose and effect of the CEA. *See* PI Br. 18–21. But Kalshi is wrong.

### 1. *The New Jersey Sports Wagering Act furthers rather than impedes the CEA.*

Nothing in the Sports Wagering Act stands as an obstacle to the purposes and objectives of the CEA. The CEA is meant to provide "a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the [CFTC]." 7 U.S.C. § 5(b). And it is intended "to deter and prevent price manipulation or any other disruptions to market integrity"; "to ensure the financial integrity of all transactions subject to [the CEA] and the avoidance of systemic risk"; "to protect all market participants from fraudulent or other abusive sales practices and misuses of customer

assets"; and "to promote responsible innovation and fair competition among boards of trade, other markets and market participants." *Id.*

The requirements of the New Jersey Sports Wagering Act *further*—rather than impede—these purposes. For instance, to ensure sufficient oversight of sports wagering in the State, the Act requires that a sports-pool operator must partner with a casino or racetrack that holds a sports wagering license. N.J. Stat. Ann. § 5:12A-11(a). And operators must comply with the security requirements for internet gaming. *Id.*; N.J. Stat. Ann. § 5:12-95.22. An operator also must provide documentation to the Division reflecting "its financial background and resources, including cash reserves, that are sufficient to demonstrate that it has the financial stability, integrity, and responsibility to operate a sports pool or online sports pool." *Id.* § 5:12A-13(a). And a sports-pool operator must "maintain a cash reserve of an amount necessary to ensure the ability to cover" sport pool wagers. N.J. Admin. Code § 13:69N-1.2(d).

These requirements of the Sports Wagering Act are wholly consistent with Congress's purpose in enacting the CEA because they too operate to "ensure the financial integrity of all transactions" and "to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets." 7 U.S.C. § 5(b). In such circumstances, there can be no conflict preemption. *See CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 82 (1987) (holding state law not preempted because it "furthers a basic purpose" of the federal statute); *Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 214, 226–28 (3d Cir. 2001) (finding state law did not stand as an obstacle to federal securities law where state law furthered

the purpose and objectives of Congress). In fact, Kalshi can offer the vast majority of its sports-related event contracts by obtaining licensure in New Jersey.

The only sports event contracts it can never offer in New Jersey are wagers on college sporting events involving New Jersey colleges or taking place in New Jersey. But the CEA's special rule itself recognizes such state-specific prohibitions: event contracts may be "contrary to the public interest" and therefore prohibited if they involve "gaming" or "activity that is unlawful under" any "State law." 7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a)(1). So not only does the CEA say that event contracts involving gaming are contrary to the public interest, but it acknowledges that States may outlaw certain activity and that the CFTC should rely on state prohibitions in deciding whether an event contract can be listed on a designated contract market.

New Jersey's policy decision to prohibit a particular small subset of sports wagers—college sporting events in New Jersey or involving New Jersey colleges—is therefore fully compatible with Congress's objective in prohibiting transactions that involve "gaming" or are "unlawful under" any "State law." Indeed, in litigation with the CFTC, Kalshi itself admitted that sports wagers fall within the definition of "gaming" and that Congress intended to prohibit gaming-related event contracts. *See* Appellee's Br. at 41, *Kalshiex LLC*, 2024 WL 4802698 ("The classic example [of an event contract involving gaming] is a contract on the outcome of a sporting event; as the legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets."). New Jersey law therefore poses no obstacle to the purposes of the CEA.

### 2. *Kalshi does not identify any obstacle to the purposes and objectives of the CEA.*

Kalshi's contrary arguments do not support obstacle preemption. To begin, the Sports Wagering Act does not undermine the intended purpose of the CEA "to bring futures markets regulation 'under a uniform set of regulations'" by subjecting Kalshi "to multiple conflicting legal regimes." PI Br. 19. The CEA expressly recognizes the applicability of both state gaming law and state laws otherwise prohibiting certain activity related to an event contract. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i)(I); *supra* at 19–21. This indicates that Congress was aware of state laws in this area and incorporated, rather than preempted, them.

And the Sports Wagering Act, even as applied to Kalshi's event contracts, does not regulate (and so does not undermine the CFTC's regulation of) the futures market. *See Am. Agric. Movement, Inc.*, 977 F.2d at 1157 ("Laws of general application … are preempted only when plaintiffs attempt to use them in a manner that would, in effect, regulate the futures markets."). Rather, the Act's imposition of licensure and related requirements on an entity in order to offer sports wagers in New Jersey—including sports wagers in the form of event contracts— does not impede the CFTC's ability to regulate that event contract. An entity like Kalshi can obtain a license from New Jersey to offer sports wagers in the State and remain under the oversight of the CFTC as a designated contract market. *Cf. Strax v. Commodity Exch., Inc.*, 524 F. Supp. 936, 942 (S.D.N.Y. 1981) (CFTC did not preempt state antitrust law since "[t]he mere fact that the New York attorney general is empowered to investigate and prosecute restraints of

30

trade does not lead to the conclusion that the actions of his office would impede the CFTC or interfere with the execution of the mandate of the CEA to regulate commodity futures trading"). The mere overlap of New Jersey's licensure requirements with the CFTC's regulation of designated contract markets does not undermine the CFTC's regulation. *See In re Volkswagen*, 959 F.3d at 1213 (explaining "the Court does not infer Congress intended to preempt state enactments merely because they overlap with a federal act").

More broadly, companies are subject to simultaneous state and federal regulation all the time. Corporations across the country routinely have to comply with, for example, state and federal antitrust laws, securities laws, drug-labeling laws, consumer-protection laws, and many others. *See, e.g.*, *Wyeth*, 555 U.S. at 581 (drug labeling); *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 579 (1976) (antitrust); *Davidson v. Sprout Foods, Inc.*, 106 F.4th 842, 852 (9th Cir. 2024) (food labeling); *Green*, 245 F.3d at 227 (securities); *Spectrum Ne., LLC v. Frey*, 22 F.4th 287, 301 (1st Cir. 2022) (consumer protection). The entire point of the presumption against preemption is that *States* are the primary regulators of health and safety. *See supra* 13–14. So the constitutional default is that companies like Kalshi will *necessarily* have to navigate interlocking state and federal laws.

It makes no difference that New Jersey outright prohibits a small subset of sports wagers—college sporting events involving New Jersey colleges or taking place in New Jersey—within the State. *Contra* PI Br. 20. The fact that New Jersey provides stronger protection against certain sports wagers does not stand as an obstacle to the CEA's weaker protection against event contracts involving the

same conduct. *See California v. ARC Am. Corp.*, 490 U.S. 93, 105 (1989) ("Ordinarily, state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law."). Such differences are generally not "sufficient both to indicate congressional intent to preempt overlapping state law." *Green*, 245 F.3d at 227. Were it otherwise, "federal law would preempt overlapping state law every time federal law did not *exactly mirror all* the state law or state laws in question." *Id.*

Similarly, the Sports Wagering Act's prohibition on a small subset of sports wagers in New Jersey does not conflict with the CEA merely because the CFTC has so far not prohibited Kalshi's event contracts involving sports wagers. *See* PI Br. 18–21. "The Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." *Kansas*, 589 U.S. at 212. So the "mere fact that state laws" overlap with federal provisions "does not even begin to make a case for conflict preemption." *Id.* at 211. "[I]n the vast majority of cases where federal and state laws overlap," the Supreme Court has explained that "allowing the States to prosecute is entirely consistent with federal interests." *Id.* at 212.

That is, "States are independent sovereigns in our federal system; they do not need Congress's permission to exercise their historic police powers." *See Just Puppies, Inc. v. Brown*, 123 F.4th 652, 664 (4th Cir. 2024) (finding Maryland law prohibiting retail sale of puppies did not stand as an obstacle to the Animal Welfare Act because the areas it regulates "are a floor"—it "does not prohibit state and local governments from adopting additional standards"). New Jersey's

prohibition on certain sports wagers does not frustrate the purpose of the CEA just because the CFTC has not yet exercised its discretion to do the same. Put differently, New Jersey, constitutionally, has taken one type of event contract off the table for CFTC approval. That does nothing to hinder the objectives of the CEA.

Finally, the Sports Wagering Act does not conflict with the CFTC's Core Principles requiring that designated contract markets provide participants "with impartial access to its markets and services," 17 C.F.R. § 38.151(b), and "maintain risk control mechanisms to prevent and reduce the potential risk of price distortions and market disruptions," *id.* § 38.255; *see* PI Br. 21. The Act does not, as Kalshi argues (at 21), "prohibit" event contracts involving sports wagering. Aside from a small subset of wagers, New Jersey law merely requires that entities obtain a license before offering sports wagers. *See supra* 4–6. It is hard to see how licensure and related requirements would conflict with Kalshi's obligation to provide "impartial access to its markets and services," 17 C.F.R. § 38.151(b), and "maintain risk control mechanisms to prevent and reduce the potential risk of price distortions and market disruptions," *id.* § 38.255.

Nor has Kalshi explained how New Jersey's prohibition on wagers for college sporting events in New Jersey or involving New Jersey colleges would make it impossible for Kalshi to comply with its obligations under the Core Principles. 17 C.F.R. §§ 38.151(b), 38.255. All Kalshi users have impartial access to "its markets and services," *id.* § 38.151(b); it's just that New Jersey users cannot partake in two narrow categories of event contracts. Nothing in the Core

33

Principles indicates that all Kalshi users must have identical capabilities once they access the designated contract market, even if it would be illegal under state law. And obviously New Jersey law does nothing to prevent Kalshi from "maintain[ing] risk control mechanisms to prevent and reduce the potential risk of price distortions and market disruptions." *Id.* § 38.255.

In any event, although Kalshi claims that New Jersey law is "in considerable tension with th[ese] principle[s]," PI Br. 21, "[t]he mere fact of 'tension' between federal and state law" is "generally not enough to establish an obstacle supporting preemption," *MD Mall Assocs., LLC*, 715 F.3d at 495 (citation omitted). And while Kalshi claims that, "[d]epending on the CTFC's interpretation of its Core Principles," it "could well be" impossible to comply with them, PI Br. 21, "[t]he existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute." *See Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982). Kalshi has failed to establish that New Jersey law stands as an obstacle to the purposes of the CEA.

## II.    The equities confirm that Kalshi is not entitled to the relief it seeks.

Because Kalshi is not likely to succeed on the merits, this Court need not reach the remaining preliminary-injunction factors. But Kalshi fails to demonstrate irreparable harm and the balance of the equities weighs in the State's favor.

### A.    Kalshi has not established irreparable harm.

Even if it could succeed on the merits, Kalshi cannot demonstrate that it "specifically and personally risks irreparable harm" without an injunction. *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000). Such harm cannot

34

be speculative; "possibility of a remote future injury" is insufficient. *Acierno*, 40 F.3d at 655. None of Kalshi's alleged injuries establishes irreparable harm.

Kalshi first claims as irreparable harm "the threat of civil liability and criminal prosecution" if it does not comply with the State's cease and desist letter. PI Br. 22. But such a threat is generally not considered to be irreparable injury because Kalshi "can raise those claims as affirmative defenses in state court." *Sherwin-Williams Co. v. County of Delaware*, 968 F.3d 264, 270 (3d Cir. 2020); *see O'Shea v. Littleton*, 414 U.S. 488, 502 (1974) (noting plaintiffs lacked irreparable injury because if they were prosecuted or illegally sentenced, state and federal remedies were available). And unlike in Kalshi's cited case, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992), Kalshi has not proven that it faces "repetitive penalties" for "continuing or repeated violations" with no "realistic option of violating the law once and raising its federal defenses," *id.* And "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *See FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980); *Kugler v. Helfant*, 421 U.S. 117, 124 (1975) (generally "the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution alone do not constitute 'irreparable injury'").

Next, Kalshi claims that it will suffer various harms from having to cease accepting sports wagers in New Jersey, including "forego[ing] business" in the State, "shuttering access to these contracts for New Jersey users," "impair[ing] existing contractual obligations amongst non-party Kalshi-users," and "distort[ing] the markets" for other users. PI Br. 22–23. But in reality, what Kalshi

must cease accepting is *unauthorized* sports wagers. That is, Kalshi may continue to accept sports wagers from New Jersey users so long as it obtains the required licensure and complies with the New Jersey Sports Wagering Act.

Kalshi's alleged injury therefore is caused not by the cease-and-desist letter, but by its failure to secure a license. "Injury caused by failure to secure a readily available license is self-inflicted, and self-inflicted wounds are not irreparable injury." *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003); *see Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) ("If the harm complained of is self-inflicted, it does not qualify as irreparable."); *State v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (similar). True, New Jersey prohibits a small subset of sports wagers on college sporting events involving New Jersey colleges or taking place in New Jersey. But Kalshi has not identified any particular New Jersey–related college games on which it intends to accept wagers during the pendency of this case; and this case presents purely legal issues that could be handled expeditiously on dispositive motions.

And any such injury would be purely economic, which is generally insufficient to establish irreparable harm. *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011). While the logic is different in cases against a sovereign, "[t]hat the Eleventh Amendment may pose an obstacle to recovery of damages in the federal court does not transform money loss into irreparable injury for equitable purposes." *Black United Fund of N.J., Inc. v. Kean*, 763 F.2d 156, 161 (3d Cir. 1985). Because Kalshi has not identified any prohibited wagers that it plans to accept during the pendency of this case, any harm from ceasing to

36

accept those hypothetical wagers is speculative. *See, e.g.*, *Acierno*, 40 F.3d at 655 ("possibility of a remote future injury" is insufficient); *Omnistone Corp. v. Cuomo*, 485 F. Supp. 3d 365, 367 (E.D.N.Y. 2020) ("[P]laintiffs' demonstration of irreparable harm must be considered in conjunction with the time frame involved.").

Nor does Kalshi's alleged "regulatory risk" of jeopardizing its status as a CFTC-designated contract market amount to irreparable harm. PI Br. 24. For one, as noted, Kalshi would not have to terminate the vast majority of its sports wagers in New Jersey if it obtained the required authorization under New Jersey law. And for the small subset of college sporting events for which it would have to cease accepting offers, Kalshi has not shown that such "regulatory risk" to its CFTC-designation is imminent or non-speculative. Kalshi can continue offering event contracts across the country as long as it complies with applicable laws.

Kalshi's claimed injury from the "technological challenges and costs" of "[a]ttempting to implement geolocation capabilities" to "geolocate its users on a state-by-state basis," PI Br. 22–23, is also insufficient. Alleged economic injury stemming from compliance with government regulation is not irreparable harm. *See A.O. Smith Corp. v. FTC*, 530 F.2d 515, 527 (3d Cir. 1976) ("[a]ny time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits," but "proof of such an injury, alone," cannot "satisfy the requisite for a preliminary injunction"); *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) ("However, ordinary compliance costs are typically insufficient to constitute irreparable harm."); *Am. Hosp. Ass'n*

*v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) (similar). Kalshi's failure to suffer irreparable harm means that its motion should be denied. *Reilly*, 858 F.3d at 179.

**B.    The public interest weighs against injunctive relief.**

Even if Kalshi could demonstrate both a likelihood of success on the merits and irreparable harm, a preliminary injunction would still not be warranted because this Court must consider whether all four preliminary injunction factors "balance in favor of granting the requested preliminary relief." *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 103 (3d Cir. 2022). When "the Government is the opposing party," the final two factors— "harm to the opposing party" and "the public interest"—merge. *Nken*, 556 U.S. at 435. Injunctive relief can be denied on that basis alone. *See, e.g.*, *Wyeth*, 555 U.S. at 23 (declining to address merits for preliminary injunction and holding that "even if plaintiffs have shown irreparable injury," it "is outweighed by the public interest and the Navy's interest in effective, realistic training of its sailors"); *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 460 (5th Cir. 2016) (affirming denial of preliminary injunction on last two factors alone). Those combined two factors weigh strongly against a preliminary injunction here.

The extraordinary remedy Kalshi demands—to exempt itself entirely from New Jersey's Sports Wagering Act—makes its burden particularly heavy: "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Del. State Sportsmen's Ass'n, Inc.*, 108 F.4th at 206 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)); *see also Abbott v. Perez*, 585 U.S. 579, 603

n.17 (2018) (explaining that the State's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State").

But the harm to the State and therefore to the public stretches well beyond this general principle. That's because New Jersey has an especially strong interest in overseeing the acceptance of sports wagers in the State and reducing the social costs associated with gambling. *See Greater New Orleans Broad. Ass'n, Inc.*, 527 U.S. at 185 ("reducing the social costs associated with 'gambling'" is a substantial interest). For instance, the Act ensures that operators are financially stable and can cover outstanding sports wagers. N.J. Stat. Ann. § 5:12A-13(a); N.J. Admin. Code § 13:69N-1.2(d). And the Act requires that participants in sports wagers are at least twenty-one years old, protecting minors from gaming. N.J. Admin. Code § 13:69O-1.2. An injunction would prevent the State from exercising its historic police powers to protect the interests of its citizens. *See Casino Ventures v. Stewart*, 183 F.3d 307, 310 (4th Cir. 1999) (gambling "restrictions are aimed at promoting the welfare, safety, and morals of [state residents]," so "they represent a well-recognized exercise of state police power"). And it would prevent the State from collecting a licensure fee from Kalshi and taxing the gross revenues from the sports wagers Kalshi accepts in the State. *See* N.J. Stat. Ann. § 5:12A-16. A portion of that fee is used to fund "prevention, education, and treatment programs for compulsive gambling," *id.*, and the taxes are used to provide vital services for eligible senior citizens and residents with disabilities, *id.* § 5:12-145(c), which promote the health and welfare of New Jerseyans.

An injunction would also be an invitation for other companies to evade New Jersey's—or any State's—sports-wagering laws by structuring their wagers as event contracts and self-certifying them with the CFTC. Such a result would severely erode States' historic police powers to regulate gambling within their borders and diminish their ability to collect fees and taxes from sports wagers.

Against these significant societal interests, Kalshi claims that "[t]he public has a first-order interest in ensuring that preempted New Jersey laws are *not* enforced against federally-regulated entities." PI Br. 23. But as explained *supra* Section I, the CEA does not preempt New Jersey's laws concerning sports wagering. And the alleged harms that Kalshi claims its users will suffer if it ceases operations in New Jersey, PI Br. 25, also do not tip the balance in favor of an injunction. Any such harm is avoidable, as Kalshi can continue to accept sports wagers in New Jersey so long as it complies with New Jersey's laws. *See supra* at 4–6. The balance of equities weighs sharply against an injunction.

## CONCLUSION

Kalshi's preliminary-injunction motion should be denied.

Respectfully Submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY


By:    /s/    *Liza B. Fleming*
Liza B. Fleming
Dated: April 18, 2025              Deputy Attorney General

40

## CERTIFICATE OF SERVICE

I certify that on April 18, 2025, I electronically filed the foregoing Brief in Opposition to Motion for a Preliminary Injunction and accompanying papers with the Clerk of the U.S. District Court for the District of New Jersey. Counsel for all parties will be served via CM/ECF.

/s/     *Liza B. Fleming*
Liza B. Fleming
Deputy Attorney General

Dated: April 18, 2025