**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| KALSHIEX LLC, | Hon. Edward S. Kiel, U.S.D.J. |
| Plaintiff, | Hon. Matthew J. Skahill, U.S.M.J. |
| vs. | Case No.: 25-cv-2152-ESK-MJS |
| MARY JO FLAHERTY, *et al.*, | **CIVIL ACTION** |
| Defendants. | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR
PRELIMINARY INJUNCTION**

Neal Kumar Katyal (pro hac vice)
Joshua B. Sterling (pro hac vice)
William E. Havemann (pro hac vice)
Milbank LLP
1850 K Street, Suite 1100
Washington D.C. 20006
Telephone: 202-835-7505
Facsimile: 213-629-5063

Mackenzie Austin (pro hac vice)
Milbank LLP
2029 Century Park East, 33rd Floor
Los Angeles, California 90067
Telephone: 424-386-4000

Gurbir S. Grewal
Milbank LLP
55 Hudson Yards
New York, New York 10001
Telephone: 212-530-5775
Facsimile: 212-530-5775

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

ARGUMENT .................................................................................................................. 3

    A.    Kalshi Is Likely To Succeed On The Merits Of Its Preemption Claim. ................ 3

    B.    Kalshi Faces Imminent Irreparable Harm Based On The Face Of The
        State's Cease-And-Desist Order. .......................................................................... 12

    C.    The Balance Of The Equities And The Public Interest Support Granting A
        Preliminary Injunction To Kalshi. ...................................................................... 14

CONCLUSION ............................................................................................................... 15

**TABLE OF AUTHORITIES**

**Cases**                                                                      **Page(s)**

*Am. Agric. Movement, Inc. v. Bd. of Trade,*
  977 F.2d 1147 (7th Cir. 1992), *abrogated on other grounds by Time Warner*
  *Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995) .................................................6, 9, 12

*Arizona v. U.S.,*
  567 U.S. 387 (2012) ................................................................................12

*Babbitt v. United Farm Workers Nat. Union,*
  442 U.S. 289 (1979) ................................................................................13

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) ...................................................................14

*Effex Capital, LLC v. Nat'l Futures Ass'n,*
  933 F.3d 882 (7th Cir. 2019) .....................................................................5

*Farina v. Nokia Inc.,*
  625 F.3d 97 (3d Cir. 2010) .........................................................................6

*Fellner v. Tri-Union Seafoods, LLC,*
  539 F.3d 237 (3d Cir. 2008) .....................................................................10

*FTC v. Ken Roberts Co.,*
  276 F.3d 583 (D.C. Cir. 2001) ...............................................................8, 9

*Garcia v. U.S.,*
  469 U.S. 70 (1984) ....................................................................................9

*Healy v. Beer Inst., Inc.,*
  491 U.S. 324 (1989) ................................................................................14

*KalshiEX, LLC v. CFTC,*
  No. 23-cv-3257, 2024 WL 4164694 (D.D.C. Sept. 12, 2024) ..................7

*KalshiEX, LLC v. Hendrick,*
  No. 2:25-cv-00575, 2025 WL 1073495 (D. Nev. Apr. 9, 2025) ..... *passim*

*Leist v. Simplot,*
  638 F.2d 283 (2d Cir. 1980) .......................................................................8

*Lewis v. Alexander,*
  685 F.3d 325 (3d Cir. 2012) .......................................................................8

*Mabey Bridge & Shore, Inc. v. Schoch,*
  666 F.3d 862 (3d Cir. 2012) .....................................................................12

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
    456 U.S. 353 (1982) ...........................................................................................9, 10

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ...................................................................................................13

*Murphy v. NCAA*,
    584 U.S. 453 (2018) ...................................................................................................15

*New Jersey Staffing All. v. Fais*,
    749 F. Supp. 3d 511 (D.N.J. 2023), *aff'd*, 110 F.4th 201 (3d Cir. 2024) ................14

*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*,
    143 F.3d 800 (3d Cir. 1998) .....................................................................................12

*Siemens USA Holdings, Inc. v. Geisenberger*,
    17 F.4th 393 (3d Cir. 2021) ......................................................................................13

*Valle del Sol v. Whiting, Inc.*,
    732 F.3d 1006 (9th Cir. 2013) ..................................................................................13

**Statutes, Legislative Record, and Legislative Materials**

120 Cong. Rec. 30,464 (Sept. 9, 1974) ...........................................................................9

7 U.S.C. §§ 1a(19) ...........................................................................................................6

7 U.S.C. § 1a(47) ......................................................................................................4, 5, 6

7 U.S.C. § 2(a)(1)(A) .......................................................................................................5

7 U.S.C. § 7a-2(c)(5)(C)(i) ...........................................................................................5, 7

7 U.S.C. § 13a-2(1) ..........................................................................................................7

7 U.S.C. § 16(e) .............................................................................................................5, 6

Concept Release, 73 Fed. Reg. 25,669 (May 7, 2008) ....................................................4

H.R. Rep. No. 97-565, pt. 1 (1982) .................................................................................5

N.J.S.A. 2C:43-3(e) .......................................................................................................13

S. Rep. No. 93-1131 (1974) .............................................................................................8

Senate Comm. On Agric., Nutrition and Forestry, 93d Cong., 2d Sess.,
    Commodity Futures Trading Comm'n Act of 1974 (1974) .....................................9

Statement of Commissioner Dan M. Berkovitz (Apr. 7, 2021), *available at* https://www.cftc.gov/PressRoom/Speeches Testimony/berkovitzstatement040721 .....................................................................................10

**Other Sources**

Jay Coffin, *Rory McIlroy's Master Victory Delivered The Most-Watch Final Round in 7 Years*, GolfDigest (Apr. 14, 2025), https://www.golfdigest.com/story/rory-mcilroy-masters-2025-win-delivered-most-watched-final-round-in-7-years ........................................................................................4

*KalshiEX LLC Rulebook*, KalshiEX, available at https://kalshi-public-docs.s3.amazonaws.com/regulatory/rulebook/Kalshi%20Rulebook%20v1.16 .pdf ........................................................................................................................................15

Mark Singelais, *Saint Peter's run to Elite Eight worth millions for MAAC*, Times Union (Mar. 28, 2022), https://www.timesunion.com/sports/article/Saint-Peter-s-run-to-Elite-Eight-worth-millions-17034811.php .......................................................4

## <u>INTRODUCTION</u>

Since filing suit in this case, Kalshi obtained a preliminary injunction in Nevada litigation presenting almost identical issues.  The Nevada District Court concluded that "because Kalshi is a CFTC-designated DCM, it is subject to the CFTC's exclusive jurisdiction and state law is field preempted."  *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575, 2025 WL 1073495, at *6 (D. Nev. Apr. 9, 2025).  The court further concluded that Kalshi showed "a likelihood of irreparable harm" because Kalshi was threatened "with imminent civil and criminal enforcement if it does not stop offering" event contracts.  *Id.* at *7.  And the other equities favored Kalshi "given that it is facing substantial monetary expenditures, reputational damage, or civil and criminal prosecution based on the defendants' demands that the defendants likely cannot make because they are preempted."  *Id.*  Defendants here barely acknowledge this decision, but it confirms that a preliminary injunction is warranted.  Kalshi should not be required to incur irreparable harm while it litigates here after another federal court granted preliminary relief.

Defendants' arguments fail on their own terms even setting aside *Hendrick*.  On the merits, there is overwhelming evidence that Congress in the Commodity Exchange Act sought to preempt state regulation of trading on designated contract markets ("DCMs") like Kalshi. Indeed, this was the principal purpose of the 1974 amendments, as confirmed by every conceivable marker of legislative intent.  Defendants offer no plausible contrary reading of the statutory grant of "exclusive jurisdiction" to the CFTC over trading on DCMs.  Their argument that sports-event contracts are not "swaps" is refuted by the text of the very same CEA provision they rely upon.  And while they rely on the Special Rule, that provision authorizes *the CFTC—* not 50 different states—to evaluate state law in determining whether certain event contracts are against the public interest.  Setting aside field preemption, allowing states to prohibit contracts that the CFTC has approved would squarely conflict with uniform federal law regulating DCMs.

1

As to irreparable harm, Defendants hardly dispute that Kalshi faces a classic Hobson's choice—incur either criminal liability or massive and irreparable reputational and compliance costs.  Defendants argue instead that Kalshi can avoid the harm by procuring a gaming license. That is wrong for reasons that are critically important to this case.  Defendants admit that they would require Kalshi to exclude certain contracts involving New Jersey sports events.  Because of the nationwide nature of DCMs, however, that would require Kalshi not only to cease offering those contracts in New Jersey, *but everywhere else*—effectively allowing New Jersey to dictate Kalshi's offerings nationwide.  And it would allow *every other state* to impose their own conditions on Kalshi, resulting in chaos and unpredictability.  Even setting that problem aside, Defendants admit that they would impose liquidity requirements that Kalshi has no reason to meet given that its contracts are fully collateralized via a clearinghouse that, pursuant to federal law, maintains its own funds and pays amounts due to market participants.  Requiring Kalshi to maintain additional liquidity under state law would be financially ruinous and redundant.

The balance of the equities and public interest considerations favor a modest injunction consistent with *Hendrick* that would avoid subjecting Kalshi to irreparable harm as this Court decides the merits.  And granting an injunction would not, as Defendants argue, create a loophole that would allow unregulated gaming.  Federal law preempts state regulation of trading on DCMs; it leaves state regulation of sportsbooks and casinos untouched.  And DCMs are among the most heavily regulated entities on Earth; the CFTC's 23 Core Principles require DCMs to maintain extensive safeguards.  The question is not whether Kalshi should be regulated, but rather by whom.  The answer is clear: The CFTC has "exclusive jurisdiction."

Defendants' cease-and-desist deadline expires on April 30, and Kalshi respectfully requests that the Court grant a preliminary injunction by that date.  Counsel for Kalshi

respectfully requests a hearing on Plaintiff's motion on any date before then.

## ARGUMENT

Defendants make two dispositive concessions.  First, they concede (at 6) that Congress "grant[ed] [the CFTC] exclusive jurisdiction over transactions regulated by the CEA."  Second, they agree (at 8) that "Kalshi is certified by the CFTC as a designated contract market and operates a derivatives exchange" offering event contracts.  These concessions confirm what Congress otherwise made clear—that Kalshi's event contracts are subject to the CFTC's exclusive jurisdiction.  A preliminary injunction is warranted.

### A.    Kalshi Is Likely To Succeed On The Merits Of Its Preemption Claim.

*1. New Jersey's laws are field-preempted*.  As the *Hendrick* court held, the statutory text, purpose, history, and the CEA's comprehensive framework clearly evince "congressional intent to occupy the field of regulating CFTC-designated exchanges and the transactions conducted on those exchanges."  2025 WL 1073495, at *6.  The "plain and unambiguous language" of Section 2's "exclusive jurisdiction" provision, and every other marker of congressional intent, confirm that state laws regulating transactions on DCMs are field-preempted.  *Id.* at *5-6.  Defendants' contrary arguments cannot overcome that evidence.

*First*, Defendants argue (at 15-16) that Kalshi's sports-event contracts are not "swaps"—and therefore do not fall within the exclusive-jurisdiction provision—because they do not have "*a potential financial, economic, or commercial consequence*."  That argument is untenable.  The sporting events for which Kalshi offers contracts have obvious financial implications.  To take one example related to Kalshi's contract on the winner of the 2025 Masters: When Rory McIlroy won in a sudden-death playoff, television viewership rose by 33% over 2024, with

enormous financial consequences for CBS and advertisers.[1]  To take another (closer-to-home) example: When Saint Peter's University in 2022 made a historic run to the Elite Eight of the NCAA Basketball Tournament, its run had millions in financial implications for the school, its community, and its conference.[2]  These are *actual* and *significant* financial consequences; they easily qualify as "potential" economic consequences under the CEA. 7 U.S.C. § 1a(47)(A)(ii).

Defendants cite (at 15-16) Kalshi's D.C. Circuit brief, in which Kalshi explained that "at least" some "contracts relating to games" do not serve a "commercial or hedging interest." But Kalshi does not offer contracts on such events.  Kalshi, unlike sportsbooks, does not offer so-called "prop bets" on events like the coin-toss winner or the color of a Gatorade shower.  Nor, as Defendants suggest (at 16), does Kalshi offer contracts on "raffles" or other events without independent economic significance.  Defendants cite a CFTC release (at 15) for the proposition that swaps were "meant to cover" events "in the heartland of the CFTC's authority" like "a specific farmer's crop yield."  *See* Concept Release, 73 Fed. Reg. 25,671 (May 7, 2008).  But that is not a faithful account of the release, which contemplates contracts involving "a multitude of subcategories, such as political or *entertainment . . . events*."  *Id.* at 25,671 (emphasis added). The release adds that the CEA "supersedes and preempts other laws, including state and local gaming and bucket shop laws, with respect to transactions executed on or subject to the rules of a Commission-regulated market."  *Id.* at 25,673.

The CEA's Special Rule disproves the contention that sports-event contracts are not

---

[1] Jay Coffin, *Rory McIlroy's Master Victory Delivered The Most-Watch Final Round in 7 Years*, GolfDigest (Apr. 14, 2025), https://www.golfdigest.com/story/rory-mcilroy-masters-2025-win-delivered-most-watched-final-round-in-7-years.

[2] Mark Singelais, *Saint Peter's run to Elite Eight worth millions for MAAC*, Times Union (Mar. 28, 2022), https://www.timesunion.com/sports/article/Saint-Peter-s-run-to-Elite-Eight-worth-millions-17034811.php.

swaps.  The Special Rule provides that "event contracts" may involve "gaming," 7 U.S.C. § 7a-2(c)(5)(C)(i)(V); and event contracts, in turn, are a type of "swap," *id.* § 1a(47)(A)(ii). Defendants' confusion over what qualifies as a swap helps explain why Congress granted the CFTC exclusive jurisdiction to regulate in this area rather than allowing a patchwork of self-interested determinations by states.  The CFTC has authority to evaluate whether Kalshi's contracts are in fact swaps—and has authorized those contracts under federal law.

*Second*, Defendants look to support in a series of CEA provisions other than the exclusive-jurisdiction provision.  Defendants cite (at 7) the two savings clauses in Section 2, but neither supports them.  One provides that "nothing contained in this section" supersedes "the laws of . . . any State." 7 U.S.C. § 2(a)(1)(A).  But the prefatory clause begins with the phrase "except as hereinabove provided," *id.*, thus making clear that the CEA does not preempt state law *except* as to transactions traded on DCMs.  *Hendrick*, 2025 WL 1073495, at *5.  The second savings clause preserves "the jurisdiction conferred on courts of the United States or any State." 7 U.S.C. § 2(a)(1)(A).  But this provision speaks to state courts' *jurisdiction*; it does not speak to whether federal or state substantive law applies in those courts, and does not bear on preemption.

Defendants cite cases holding that the existence of these savings clauses is incompatible with field preemption, but these cases turned critically on how broadly the field was defined. These cases rejected preemption of "the entire field of commodity futures regulation."  *See, e.g.*, *Effex Capital, LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019).  Kalshi of course agrees that the CEA does not preempt a field that includes off-exchange trading.  *See* 7 U.S.C. § 16(e); H.R. Rep. No. 97-565, pt. 1, at 43 (1982) (state authorities may police "transactions outside those preserved exclusively for the jurisdiction of the CFTC").  Congress instead preempted the field of *trading on DCMs*.  Precedent—including precedent Defendants cite—

universally supports that narrower preemption.  *See Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1156-57 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 (7th Cir. 1995); *see also Farina v. Nokia Inc.*, 625 F.3d 97, 121-22 n.25 (3d Cir. 2010) (rejecting broad field preemption claim but recognizing that "the scope of a field deemed preempted by federal law" turns on how "narrowly" it is defined).

Defendants cite Section 16, which undermines their position further still.  It provides that "[n]othing in" the CEA preempts application of a "State statute . . . to any transaction in or involving any commodity . . .  *that is not conducted on or subject to the rules of a [DCM]*." 7 U.S.C. § 16(e)(1)(B)(i) (emphasis added).  The only coherent inference is that the CEA *does* preempt application of state law to transactions—like Kalshi's event contracts—that *are* conducted on DCMs.  Defendants claim in a footnote that this provision does not apply to swaps (at 22 n.4), but that is wrong.  A swap is, by definition, a type of "transaction" involving a type of "commodity." 7 U.S.C. §§ 1a(19), (47).  Defendants cite (at 21) two sub-provisions in Section 16 that expressly preempt state bucket-shop laws and insurance laws, which Defendants claim raise an inference that state gaming laws are not preempted.  *See* 7 U.S.C. §§ 16(e)(2), (h).  But in both provisions, Congress preempted state laws regarding transactions *that do not necessarily occur on DCMs*, which is why it was necessary to specify that the laws are preempted.  It would have been redundant and confusing to specify preemption of gaming laws related to transactions on DCMs; that is what the exclusive-jurisdiction provision already accomplishes.[3]

*Third*, Defendants rely heavily (at 20) on the Special Rule.  They argue that Kalshi's

---

[3] Section 13a-2, moreover, authorizes appropriate officials "of any State" to bring suit regarding "any act or practice constituting a violation of any provision of this chapter or any rule . . .  of the [CFTC]" against parties "*other than a [designated] contract market*."  7 U.S.C. § 13a-2(1) (emphasis added).  Congress thus did not want states to bring enforcement actions against DCMs under federal law—let alone under the state's own law.

event contracts involve an "activity that is unlawful" under state law pursuant to the Special Rule and that "Congress *wanted* state laws to apply when those laws affect event contracts."

This argument is obviously incorrect. The plain text of the Special Rule authorizes "*the Commission*"—not 50 states—to determine whether a contract involves a category listed in the Special Rule and, if so, whether the contract is "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added). Congress's decision to authorize one federal regulator to make this public-interest determination is utterly incompatible with allowing every state to disagree.[4] Contrary to Defendants' claim (at 21), there is nothing "bizarre" about barring state enforcement while allowing the CFTC to account for state law in its own review. It is commonplace for Congress to require federal authorities to consider state law while applying federal law.[5]

Defendants claim (at 19) that the "CFTC's own interpretation of the special rule bolsters" their position, but this borders on a misrepresentation. The CFTC's brief stated unequivocally that "*due to federal preemption*, event contracts *never violate state law* when they are traded on a DCM." CFTC Brief at *27, *KalshiEx*, 2024 WL 4512583 (emphasis added). The portions of the brief that Defendants cite argue merely that *the CFTC* must take state laws into account to determine whether certain event contracts trigger the Special Rule. *Id.* at *54. As to *who decides* whether to permit a DCM's event contracts, the CFTC's position is clear: It is the CFTC.

---

[4] Defendants misunderstand how the Special Rule operates in claiming (at 19) that Kalshi's event contracts involve "activity that is unlawful under any Federal or State law." As the D.D.C. held, the only interpretation of the Special Rule "that actually works" is if the contract's "underlying event relates in some way to activity that is illegal—not if the act of staking money on the contract's underlying [event] would be unlawful under any state law." *KalshiEX LLC v. CFTC*, No. 23-cv-3257, 2024 WL 4164694, at *12 (D.D.C. Sept. 12, 2024). Sports events are not unlawful in New Jersey, and sports-event contracts therefore do not implicate the Special Rule's unlawful-activity category.

[5] *See, e.g. Lewis v. Alexander*, 685 F.3d 325, 344 (3d Cir. 2012) (acknowledging that "[s]tate law obviously plays a role" in determining Medicaid eligibility and administering the "comprehensive system of asset-counting rules" in the Medicaid framework).

*Fourth*, Defendants cite no case decided by any court at any level holding that states may regulate trading on a DCM. Precedent dating back a half-century rejects that view. Defendants are quite wrong to contend (at 25) that Kalshi "cites no case holding that Congress occupied the entire field of derivatives trading on CFTC-regulated exchanges to the exclusion of state law." To take one example, Judge Friendly found it "clearly" wrong that regulating DCMs is "traditionally relegated to state law" given that the CEA "preempts the application of state law" to DCMs. *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). The D.C. Circuit likewise held that "the CFTC's jurisdiction was 'to be exclusive with regard to the trading of futures *on organized contract markets*.'" *FTC v. Ken Roberts Co.*, 276 F.3d 583, 590-91 (D.C. Cir. 2001) (quoting S. Rep. No. 93-1131, at 23 (1974)). And while the Seventh Circuit rejected the view that the entire field of derivatives trading—including off-exchange trading—was preempted, state law *was* "preempted" "[w]hen application of state law would directly affect trading on or the operation of a futures market." *Am. Agric. Movement*, 977 F.2d at 1156-57.

Nor can plaintiffs overcome the clear evidence of Congress's purpose. Defendants cite (at 18) an out-of-context statement in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386-87 (1982), to suggest that Congress was "only" concerned with overlapping jurisdiction between the SEC and CFTC. But while Congress was concerned about SEC encroachment, it was also "concerned that the states . . . might step in to regulate the futures markets themselves." *Am. Agric. Movement*, 977 F.2d at 1156. As courts have easily found, Congress intended to bring exchanges "under a uniform set of regulations" because "a contract market could not operate efficiently, and perhaps not at all," if subject to competing legal regimes. *Id.*; *see also Ken Roberts*, 276 F.3d at 588.

If the clear textual evidence leaves any doubt, the legislative history dispels it.

Defendants criticize (at 25) Kalshi's "reliance on the statements of individual legislators" even though they rely on similar statements where it suits them (at 16). More important, Defendants fail to address the "joint explanatory statement" on the 1974 Amendments in the conference report: "Under the exclusive grant of jurisdiction to the Commission," the CEA "preempt[s] the field insofar as futures regulation is concerned." Senate Comm. On Agric., Nutrition and Forestry, 93d Cong., 2d Sess., Commodity Futures Trading Comm'n Act of 1974, at 11 (1974); *see Garcia v. United States,* 469 U.S. 70, 76 (1984) (committee reports are an "authoritative source" of legislative "intent"). Defendants, moreover, venture no explanation why Congress would have deleted a provision preserving states' authority to regulate DCMs if Congress nonetheless intended that result. *See* 120 Cong. Rec. 30,464 (Sept. 9, 1974).

*Fifth*, Defendants contend (at 17-18) that the CEA's framework is not comprehensive. The Supreme Court disagrees: The CEA establishes "a comprehensive regulatory structure" to oversee futures trading markets. *Merrill Lynch*, 456 U.S. at 356; *see also Hendrick*, 2025 WL 1073495, at *6-8. It would be difficult to identify a more comprehensive suite of federal regulations than those governing DCMs. Congress set out a reticulated scheme for exchanges to obtain DCM status; for subjecting DCMs to a framework of "exclusive" CFTC oversight; for authorizing review of contracts offered by DCMs; for the CFTC to exercise discretion in policing violations; and for states to enforce the CEA in certain circumstances *but not against DCMs*. Given this detailed scheme, Defendants offer no plausible basis to infer that Congress silently intended to give states free rein to prohibit trading on DCMs under state law.

*Finally*, Defendants fall back on the presumption against preemption. But the presumption does not apply to the quintessentially federal field of regulating the derivatives markets. Even if the presumption applied, it is "overcome where a Congressional purpose to

preempt or the existence of a conflict is 'clear and manifest.'" *Fellner v. Tri-Union Seafoods, LLC*, 539 F.3d 237, 249 (3d Cir. 2008). The CEA's intent to preempt state laws is clear for all the reasons already noted. And Defendants' reliance on the presumption against preemption is especially untenable given the breadth of their argument. While this case arises in the context of state gambling laws, Defendants' interpretation of the CEA (at 13) would mean that states may regulate *any* event contracts traded on DCMs that fall within their "traditional police powers." No limiting principle confines their argument to gambling laws, and their interpretation would result in a radical revision of the CEA—yet another reason to reject it.

2. *New Jersey's laws are conflict-preempted as applied to Kalshi.* New Jersey's gambling laws are likewise conflict-preempted by the CEA for numerous reasons.

*First*, complying with New Jersey's laws would conflict with the CEA Core Principles. Immediately voiding Kalshi's event contracts in New Jersey, as Defendants demand, would run afoul of the Core Principles requiring DCMs to avoid market disruptions and provide impartial access to exchanges. Defendants claim (at 33-34) that "[n]othing in the Core Principles indicates that all Kalshi users must have identical capabilities once they access the designated contract market." But that is what "impartial access" means. DCMs may restrict access based on neutral principles like the "financial and operational soundness" of the market participant—but not based on the happenstance of geography.[6] This conflict is not, as Defendants claim (at 34), "hypothetical." It is the clear upshot of the Core Principles' text.

*Second*, allowing New Jersey to bar Kalshi's event contracts would conflict directly with

---

[6] *See, e.g.*, Statement of Commissioner Dan M. Berkovitz (Apr. 7, 2021), *available at* https://www.cftc.gov/PressRoom/SpeechesTestimony/berkovitzstatement040721 (DCM's proposal to limit trading on certain sports event contracts "is the very kind of discrimination based on net worth that the Commission has prohibited.").

the CFTC's authorization of the very same contracts. Kalshi self-certified and listed sports-event contracts on its exchange on January 24, 2025. Compl. ¶ 49. The contracts were effective upon self-certification, and although the CFTC has tools for restricting access to contracts it deems to violate federal law, it has declined to invoke those tools. *Id.* Kalshi's sports-event contracts are therefore legal under federal law. *Id.* Defendants contend (at 32-33) that enforcement of New Jersey law would complement rather than conflict with federal enforcement because the CEA sets a floor that state law can surpass. But a federal law does not provide a "floor" where, as here, "the federal standards are intended to be uniform throughout the country, invalidating more restrictive state requirements." *Mabey Bridge & Shore, Inc. v. Schoch*, 666 F.3d 862, 869 (3d Cir. 2012). While Defendants claim New Jersey laws are "wholly consistent" with the purposes of the CEA at a high level of generality, the Supreme Court rejected a substantially similar argument in *Arizona*, where a state claimed that a statute allowing state officials to arrest removable immigrants complemented federal immigration law. *Arizona v. United States*, 567 U.S. 387, 409 (2012). Here, much as in *Arizona*, Congress left the decision whether to permit event contracts to "the discretion of the Federal Government," *id.*, and allowing concurrent state enforcement would conflict with that discretion.

*Third*, Defendants' efforts to enforce state law against Kalshi would conflict with Congress's intent to create uniform regulations for futures trading on federal exchanges. As the Seventh Circuit held, a state law that "would directly affect trading on or the operation of a futures market" regulated by the CFTC "is preempted." *Am. Agric. Movement*, 977 F.2d at 1156-57. That holding makes sense. If New Jersey can impose its own laws on Kalshi, nothing stops the 49 other states and D.C. from doing the same. Fifty-one different regimes for licensing, permissible contracts, age limits, and liquidity standards would grind a national DCM to a halt.

**B.**     **Kalshi Faces Imminent Irreparable Harm Based On The Face Of The State's Cease-And-Desist Order.**

As the District of Nevada concluded, "Kalshi has met its burden of showing a likelihood of irreparable harm." *Hendrick*, 2025 WL 1073495, at *7. Defendants agree as far as reputational harm is concerned; they make no effort to rebut Kalshi's claim that it will suffer reputational harm absent an injunction. Loss of goodwill alone can constitute irreparable harm. *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill."). Additionally, just as in Nevada, Defendants' cease-and-desist letter threatens Kalshi with a Hobson's choice: It must either continue offering its contracts in New Jersey and "expose [itself] to potentially huge liability," or "suffer the injury of obeying the law during the pendency of the proceedings" and risk massive irreparable costs and the loss of its CFTC designation. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).

Kalshi is left with no way to avoid harm. If Kalshi declines to comply, Defendants do not dispute that state enforcement is imminent. Defendants nonetheless claim (at 35) that Kalshi faces no harm because it "has not proven" it faces "repetitive penalties." But if Kalshi continues offering event contracts without a license, there is a clear risk of repetitive penalties. *See* N.J.S.A. 2C:43-3(e). More importantly, *Morales* did not involve potential *criminal* liability. Where a "credible threat of prosecution" exists under a "state statute" that proscribes "conduct arguably affected with a constitutional interest," a plaintiff "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979); *see Siemens USA Holdings Inc v. Geisenberger*, 17 F.4th 393, 409 (3d Cir. 2021) (threat of prosecution constitutes "an injury in itself"); *Valle del Sol v. Whiting, Inc.*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("credible threat of prosecution under"

preempted statute "establishe[s] a likelihood of irreparable harm").

If, on the other hand, Kalshi acquiesces to the demand to "immediately cease and desist from offering" sports-event contracts in New Jersey, Ex. 1 at 2, it will likewise face irreparable harm. Defendants do not dispute that ceasing sports-event contracts in New Jersey would require Kalshi to implement geolocation and cost millions. *See* Decl. ¶¶ 15-21. Defendants' extraordinary demand that Kalshi "void" *existing* contracts, Ex. 1 at 1, would additionally subject Kalshi and its users to myriad harms and cast doubt on the integrity of Kalshi's exchange. *See* Decl. ¶¶ 29-37. Defendants claim that Kalshi's monetary harm is not "irreparable" (at 2), but they do not dispute (at 36) that the Eleventh Amendment would "pose an obstacle to recovery of damages" against a sovereign. *See New Jersey Staffing All. v. Fais*, 749 F. Supp. 3d 511, 521 (D.N.J. 2023), *aff'd*, 110 F.4th 201 (3d Cir. 2024) (finding irreparable harm where "movant 'will suffer *at least some harm* that cannot be compensated through an award of money damages'" due to immunities) (emphasis added); *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (economic harm "is irreparable here because the states will not be able to recover monetary damages" due to immunity). Nor can Defendants dispute the other harms that would follow from closing Kalshi's doors in New Jersey and the likelihood of copycat enforcement efforts should Defendants succeed.

Defendants posit a third option, which is that Kalshi should procure a gaming license. This option is illusory for a host of reasons. As Defendants concede, seeking a New Jersey license would require Kalshi to stop offering contracts New Jersey prohibits—namely, event contracts on certain college sporting events. But given the CEA's impartial access requirement, New Jersey agrees (at 33) that federal law would require Kalshi to prohibit those contracts not just in New Jersey, but *across the country*. New Jersey thus effectively claims the authority to

regulate Kalshi's contracts nationwide. *See Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) ("a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority"). Still worse, if New Jersey were correct, every other state would have the same right to dictate which contracts are and are not permitted—not just in their state, but everywhere else. "Preventing the difficulties that would create is the reason Congress granted the CFTC exclusive jurisdiction over CFTC-designated exchanges." *Hendrick*, 2025 WL 1073495, at *7.

The problems with licensure do not end there. Compliance with New Jersey's panoply of licensure requirements would be impossible in practice. For example, as Defendants concede (at 5), a license would require Kalshi to maintain "a cash reserve of an amount necessary to ensure the ability to cover" all outstanding unpaid "wagers." This requirement makes sense for sportsbooks that are the counterparties to wagers and must be prepared to pay if they lose, but it makes no sense—and would be ruinous—for Kalshi. Kalshi facilitates contracts between private parties; it is not the counterparty to any trade; and it works with a clearinghouse that must, subject to federal law, be fully collateralized to protect investors. *See* Decl. ¶ 27. By demanding that Kalshi maintain cash reserves, Defendants inadvertently highlight the inaptness of state regulation. Nothing about Kalshi's failure to get a license is "self-inflicted;" it is the result of the impossibility of complying with a state licensing regime that does not apply to DCMs.

### C.    The Balance Of The Equities And The Public Interest Support Granting A Preliminary Injunction To Kalshi.

As the District of Nevada held, "[t]he balance of hardships tips in Kalshi's favor given that it is facing substantial monetary expenditures, reputational damage, or civil and criminal prosecution based on the defendants' demands that the defendants likely cannot make because they are preempted." *Hendrick*, 2025 WL 1073495, at *7. Defendants identify no

countervailing public interest. Their claim (at 3) that "the State has long maintained that '[g]ambling is an activity rife with evil'" rings hollow after recent policy changes. *See Murphy v. NCAA*, 584 U.S. 453, 458 (2018) ("The State of New Jersey wants to legalize sports gambling . . ."). And the consumer-protection interests Defendants invoke are either unnecessary for DCMs or already addressed by federal law. Kalshi proactively complies with the federal "Anti-Money Laundering (AML) and Know Your Customer (KYC) protections."[7] DCMs must also comply with structural requirements that operate much like New Jersey's internal control procedures. *See* 17 C.F.R. pt. 38.

Defendants need not fear (at 40) that "other companies" could evade New Jersey's sports-wagering laws "by structuring their wagers as event contracts and self-certifying them with the CFTC." The CEA's exclusive-jurisdiction provision preempts state law only as applied to transactions on DCMs, and leaves regulation of sportsbooks and casinos untouched. Even if other DCMs begin offering sports-event contracts, Defendants are wrong to suggest this would result in unregulated gaming. The question here is not whether trading on DCMs should be regulated, but by whom. Congress's clear answer is that the CFTC has "exclusive jurisdiction."

## CONCLUSION

For the foregoing reasons, the Court should grant a preliminary injunction in favor of Plaintiff by April 30, 2025.

Respectfully submitted,

/s/ *Gurbir S. Grewal*

Gurbir S. Grewal
Dated this 23rd day of April, 2025.                    Milbank LLP

---

[7] *See KalshiEX LLC Rulebook*, KalshiEX, at 3.5(a), 3.4(c), 3.6(g), available at https://kalshi-public-docs.s3.amazonaws.com/regulatory/rulebook/Kalshi%20Rulebook%20v1.16.pdf.

## CERTIFICATE OF SERVICE

I certify that on April 23, 2025, I electronically filed the foregoing Reply in Support of

Motion For Preliminary Injunction and accompanying papers with the Clerk of the U.S. District

Court for the District of New Jersey.  Counsel for all parties will be served via CM/ECF.


_/s/ Gurbir S. Grewal_

Gurbir S. Grewal

Dated this 23rd day of April, 2025.                    Milbank LLP