UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **KALSHIEX LLC,**<br><br>   **Plaintiff,**<br><br>  v.<br><br>**MARY JO FLAHERTY,** *et al.***,**<br><br>   **Defendants.** | Case No. 25–cv–02152–ESK–MJS<br><br><br>OPINION |

**KIEL, U.S.D.J.**

  **THIS MATTER** is before the Court on plaintiff KalshiEX LLC's (Kalshi) motion for a temporary restraining order and preliminary injunction. (ECF No. 2 (Kalshi Mot.).)[1] For the following reasons, the motion will be GRANTED.

  **I. BACKGROUND**

  Kalshi is a financial services company principally located in New York that operates a derivatives exchange and prediction market. (ECF No. 1 (Compl.) p. 4.) Defendant New Jersey Division of Gaming Enforcement (the Division) is an independent state agency within the New Jersey Attorney General's office that promulgates rules and regulations for the licensing and operating of gaming in New Jersey, enforces state gaming laws and regulations, and monitors casino operations for compliance and conducts related

---

[1] Kalshi stated in its moving brief that if I am able to resolve its motion for a preliminary injunction prior to the then-applicable compliance deadline of April 7, 2025, a temporary restraining order would be unnecessary. (Kalshi Mot. p. 4.) The parties thereafter agreed to extend the compliance deadline to April 30, 2025. (ECF No. 6 (Apr. 1, 2025 Letter).) Because I am filing this decision while the status quo remains in effect, I do not consider whether a temporary restraining order is warranted.

investigations. (*Id.* pp. 4, 5.) Defendant Mary Jo Flaherty is sued in her official capacity as interim director of the Division. (*Id.* p. 4.) Defendant New Jersey Casino Control Commission (the Commission) is an independent state agency that licenses casinos and related key employees. (*Id.* p. 5.) Defendants James T. Plousis, Alisa Cooper, and Joyce Mollineux are sued in their official capacities as chairman, vice chair, and commissioner of the Commission, respectively. (*Id.*) Defendant Matthew J. Platkin is sued in his official capacity as Attorney General of New Jersey. (*Id.*)

### A. Event Contracts

A derivative is a financial instrument or contract with a price that is directly dependent on the value of one or more underlying assets. *KalshiEX LLC v. Commodity Futures Trading Comm'n*, Case No. 23–03257, 2024 WL 4164694, at *1 (D.D.C. Sept. 12, 2024), *stay denied*, 119 F.4th 58 (D.C. Cir. 2024). An event contract is a specific type of derivative with a payoff based on a specified event, occurrence, or value. *Id.* at *2. These contracts are generally binary, the buyer may take a "yes" position that the specified event will take place whereby the seller implicitly takes the "no" position. *Id.* The contract specifies the value to be paid and may be purchased or sold at any time prior to its expiration date. *Id.* When the contract expires, the seller must pay the buyer if the event occurs and the buyer is not paid if the event does not occur. *Id.*

The Commodity Exchange Act (CEA) was enacted in 1936 to regulate transactions on commodity futures exchanges. Derek Fischer, Note, *Dodd-Frank's Failure to Address CFTC Oversight of Self-Regulatory Organization Rulemaking*, 115 Colum. L. Rev. 69, 69 (2015). In 1974, Congress established the Commodity Futures Trading Commission (CFTC), which has since maintained authority over futures trading. *Id.* at 70. The 1974 amendments to the CEA were prompted, at least in part, by concerns that states might

regulate futures markets—resulting in conflicting regulatory requirements—in light of increased commodities trading and other exigencies of the time. *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992); *see also Fed. Trade Comm'n v. Ken Roberts Co.*, 276 F.3d 583, 590–91 (D.C. Cir. 2001) ("[T]he statute's legislative history repeatedly emphasizes that the CFTC's jurisdiction was 'to be exclusive with regard to the trading of futures *on organized contract markets.*'") (quoting S. Rep. No. 93–1131, at 23 (1974))).

In 2010, Congress amended the CEA through the Dodd-Frank Act and provided the CFTC oversight over swaps. *DTCC Data Repository (U.S.) LLC v. U.S. Commodity Futures Trading Comm'n*, 25 F. Supp. 3d 9, 12 (D.D.C. 2014). Under the CEA, a "swap" includes an agreement, contract, or transaction "that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. §1a(47)(a)(ii). An "excluded commodity" includes an occurrence, extent of an occurrence, or contingency that is beyond the control of the parties and is associated with a financial, commercial, or economic consequence. *Id.* at §1a(19)(iv).

An entity seeking to be designated as a contract market must submit an application and relevant materials to the CFTC. 7 U.S.C. §7(a); 17 C.F.R. §38.3(a). The application must include information sufficient to demonstrate compliance with various core principles. 17 C.F.R. §38.3(a)(2). It is unlawful for any person, other than an eligible contract participant, to enter into a swap if it is not entered on, or subject to the rules of, a board of trade designated as a contract market. 7 U.S.C. §2(e). Absent limited exceptions, the CFTC possesses exclusive jurisdiction over futures, options, and swaps traded on

designated contract markets. Dave Aron & Matt Jones, *States' Big Gamble on Sports Betting*, 12 UNLV Gaming L.J. 53, 63 (2021) (citing 7 U.S.C. § 2(a)(1)(A)).

A designated contract market may seek CFTC approval for any new contract. 7 U.S.C. § 7a–2(c)(4). Alternatively, a designated contract market may list a new contract and submit a certification that the contract complies with the CEA. *Id.* § 7a–2(c)(1); Saule T. Omarova, *License to Deal: Mandatory Approval of Complex Financial Products*, 90 Wash. U. L. Rev. 63, 109 (2012) (same). The CEA contains a "[s]pecial rule" pertaining to event contracts, meaning "the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency … by a designated contract market or swap execution facility …." 7 U.S.C. § 7a–2(c)(5)(C)(i). Under the special rule, the CFTC may determine that an agreement, contract, or transaction is contrary to the public interest if it involves an activity that is unlawful under federal or state law, terrorism, assassination, war, gaming, or a similar activity. *Id.*; *see also* Michael P. Vandenbergh, Kaitlin Toner Raimi & Jonathan M. Gilligan, *Energy and Climate Change: A Climate Prediction Market*, 61 UCLA L. Rev. 1962, 1994 (2014) (noting the CFTC's jurisdiction over event contracts and authority to determine whether they are contrary to the public interest). In such cases, the CFTC must take final action within 90 days absent an extension. 7 U.S.C. § 7a–2(c)(5)(C)(iv).

### B.  Kalshi and the Cease-and-Desist Letter

The CFTC certified Kalshi as a designated contract market in 2020. (Compl. p. 10.) On January 24, 2025, Kalshi self-certified and began listing sports-related contracts such as those buying or selling positions on which team will advance in a given round of a college basketball tournament. (*Id.* p. 11.) The CFTC has not reviewed or prohibited Kalshi's sports-related contracts despite possessing the authority to do so. (*Id.*)

On March 27, 2025, the Division sent a cease-and-desist letter to Kalshi's chief executive officer, Tarek Mansour. (ECF No. 1–1 (Mar. 27, 2025 Letter).) The Division asserted that Kalshi was listing unauthorized sports wagers in violation of both the New Jersey Sports Wagering Act (Sports Wagering Act) and New Jersey Constitution. (*Id.* p. 2.) The Sports Wagering Act prohibits entities other than sports wagering licensees—or an applicant or internet sports pool operator acting on behalf of a licensee—from offering sports wagering. N.J. Stat. Ann. §5:12A–11(c). A violation constitutes a crime of the fourth degree subject to a fine of up to $100,000. *Id.* The New Jersey Constitution further permits wagering on professional, college, and amateur sport and athletic events, but not "on a college sport or athletic event that takes place in New Jersey or on a sport or athletic event in which any New Jersey college team participates regardless of where the event takes place." N.J. Const. art. iv, §7, ¶2(D).

The Division demanded Kalshi to immediately cease and desist the offering of any sports wagering to New Jersey residents and to void any existing wagers. (Mar. 27, 2025 Letter p. 2.) The Division provided Kalshi until 11:59 p.m. on March 28, 2025 to confirm that it had ceased sports wagering activities in New Jersey and voided existing wagers subject to enforcement for failure to comply. (*Id.* p. 3.) Kalshi and the Division were unable to reach an agreement. (Compl. pp. 12, 13.) Kalshi then filed the instant complaint alleging that the threat of enforcement under the New Jersey Constitution and Sports Wagering Act encroaches upon the CFTC's exclusive jurisdiction and is preempted under the Supremacy Clause. (*Id.* pp. 14, 15.) Kalshi seeks declaratory and injunctive relief. (*Id.* pp. 15, 16.)

The pending motion followed, wherein Kalshi advised that the parties had agreed to maintain the status quo until April 7, 2025. (Kalshi Mot. p. 4.) I scheduled a hearing. (ECF No. 4.) The parties submitted a joint letter on

April 1, 2025 stating that the Division had further extended the compliance deadline to April 30, 2025, seeking adjournment of the motion hearing, and setting forth a proposed briefing schedule. (Apr. 1, 2025 Letter.) I granted the parties' requests (ECF No. 9) and the parties completed motion practice, (ECF No. 15 (Defs.' Opp'n Br.), ECF No. 17 (Kalshi Reply Br.)).

## II. PRELIMINARY INJUNCTION MOTIONS

To obtain a preliminary injunction, the movant must demonstrate both a likelihood of success on the merits and that it will more likely than not suffer irreparable harm without relief. *Mallet and Co. Inc. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021). If the two threshold factors are met, the court moves on to the two remaining factors—whether granting the requested relief will result in an even greater harm to the nonmovant or other interested party and whether the public interest favors relief—and balances the four factors together. *Id.* When the nonmovant is the government, the third and fourth factors merge. *Shelley v. Metzger*, 832 F. App'x 102, 104 (3d Cir. 2020).

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "While, the posting of a bond is rarely discretionary, '[t]he amount of the bond is left to the discretion of court.'" *Marine Elec. Sys., Inc. v. MES Fin., LLC*, 644 F. Supp. 3d 84, 96 (D.N.J. 2022) (alteration in original) (quoting *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 210 (3d Cir. 1990)); *see also Boynes v. Limetree Bay Ventures LLC*, 110 F.4th 604, 611 (3d Cir. 2024) ("We have held that posting a bond is 'almost mandatory'; any exceptions are 'rare.'" (quoting *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988))).

6

### III. DISCUSSION

#### A. Likelihood of Success on the Merits

To establish a likelihood of success on the merits, the movant "must show that 'there is "a reasonable chance, or probability, of winning,"'" which does not require a "more-likely-than-not showing of success on the merits." *Mallet and Co. Inc.*, 16 F.4th at 380 (quoting *In re Revel AC*, 802 F.3d 558, 568 (3d Cir. 2015) and *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 n.3 (3d Cir. 2017)). The parties' arguments related to Kalshi's likelihood of success on the merits turn on whether the CEA and CFTC's jurisdiction over designated contract markets preempt the New Jersey Constitution and Sports Wagering Act to the extent that the Division threatens enforcement.

#### 1. Preemption and Party Arguments

Under the Supremacy Clause, the constitution and laws of the United States "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. The three general classes of preemption are express preemption, field preemption, and conflict preemption. *Pennsylvania v. Navient Corp.*, 967 F.3d 273, 287 (3d Cir. 2020). Express preemption, as the name implies, takes place when Congress expressly preempts state law within the statute's language. *Id.* Field preemption applies "when Congress does not expressly preempt state law but where '"federal law leaves no room for state regulation and that Congress had a clear and manifest intent to supersede state law" in that field.'" *Id.* (quoting *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 688 (3d Cir. 2016)). Lastly, conflict preemption occurs "when a state law conflicts with federal law such that compliance with both state and federal regulations is impossible, or when a challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of a federal law.'" *Id.* (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)).

Kalshi asserts that field preemption applies because the text of the CEA makes clear that the CFTC has exclusive jurisdiction over accounts, agreements, and transactions traded on designated contract markets. (Kalshi Mot. p. 14.) This interpretation is supported by the CEA's purported purpose and drafting history. (*Id.* pp. 15–17.) The CEA's comprehensive regulatory scheme further demonstrates an intent to foreclose concurrent state jurisdiction, according to Kalshi. (*Id.* pp. 17, 18.)

Kalshi also contends that conflict preemption applies. (*Id.* pp. 18–22.) Congress's amendments to the CEA in 1974 were intended to bring futures markets under a uniform set of regulations and the Division's actions conflict with that goal. (*Id.* p. 19.) The CFTC had authority to review and determine whether Kalshi's sports-related contracts are contrary to the public interest but did not act. (*Id.* pp. 20, 21.) Kalshi claims that subjecting it to New Jersey law would undermine congressional calibration of force and conflict with the CFTC's evaluation of the public interest. (*Id.*) Abruptly closing its sports-related contracts could further place Kalshi in tension with CFTC core principles requiring impartial access to trading privileges and reduction of risk of price distortion and market disruption. (*Id.* pp. 21, 22.)

Defendants counter that the CEA's exclusive-jurisdiction provision does not cover the sports-related contracts at issue because they are not associated with a potential financial, economic, or commercial consequence and state law still applies to contracts that do not fall within CFTC's exclusive jurisdiction. (Defs.' Opp'n Br. pp. 25–27.) Even if the exclusive-jurisdiction provision applies, defendants argue that its purpose was to separate CFTC and Securities and Exchange Commission (SEC) functions. (*Id.* pp. 27, 28.) The savings clauses within 7 U.S.C. §2(a)(1)(A) and reference to state law in the special rule for event contracts evidence intent not to occupy the field. (*Id.* pp. 28–31.) Had Congress sought to preempt state law, it would have done so. (*Id.* p. 32.)

Kalshi's conflict preemption argument stands on shakier ground, according to defendants. (*Id.* pp.37–44.) The Sports Wagering Act complements the CEA in ensuring financial integrity of transactions and protecting participants from abuse. (*Id.* p.38.) Absent a small set of contracts related to collegiate athletics, Kalshi may continue to offer its sports-related contracts so long as it obtains New Jersey licensure. (*Id.* pp.39, 42, 43.) The CEA's special rule for event contracts expressly recognizes the applicability of state law and New Jersey's stronger protections relating to sports wagers do not stand as an obstacle to the CEA's regulation of event contracts, according to defendants. (*Id.* pp.40–42.)

### 2. Analysis

Earlier this month, a court in the District of Nevada considered a substantially similar motion for preliminary injunction involving Kalshi. In that case, Kalshi sought to enjoin the Nevada Gaming Commission, Nevada Gaming Control Board, and their members from enforcing Nevada law against its event contracts, particularly those involving sports and election results. *KalshiEX, LLC v. Hendrick*, Case No. 25–00575, 2025 WL 1073495, at *1–2 (D. Nev. Apr. 9, 2025). Faced with similar preemption arguments as those presented here, the court first concluded that the plain language of 7 U.S.C. §2(a)(1)(A) grants the CFTC exclusive jurisdiction over accounts, agreements, and transactions involving swaps or contracts of sale of a commodity for future delivery traded or executed on designated exchanges. *Id.* at *5. Though the paragraph's second sentence provides that state regulatory authority is not superseded, that sentence must be read in the context of the first, which supersedes SEC and state authority over contracts on designated exchanges. *Id.* The second sentence therefore merely preserves SEC and state authority over contracts that are not subject to the CFTC's exclusive jurisdiction. *Id.*

9

Even if express preemption did not apply, the exclusive-jurisdiction language reflects an intent to occupy the field and the defendants cited no authority to the contrary. *Id.* at *6. As field preemption applied and the CFTC had not disapproved of the sports-related contracts, the defendants were unable to impose civil or criminal penalties against Kalshi. *Id.* Even if the sports-related contracts constituted gaming, it would not have subjected Kalshi to state gaming law, according to the court, but rather the CFTC's public-interest review. *Id.*

Defendants acknowledge the District of Nevada result but argue that the court failed to consider various CEA provisions in depth. (Defs.' Opp'n Br. p.36.) Defendants specifically reference the threshold applicability of the exclusive-jurisdiction provision, the savings clauses, the special rule's reference to state law, and the CEA's narrow express-preemption provisions. *Id.*

To begin, that 7 U.S.C. §16 contains express preemption provisions does not foreclose implied preemption elsewhere within the CEA. "[I]mplied preemption may exist even in the face of an express preemption clause." *Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 239 (3d Cir. 2009); *see also* Aron & Jones, *supra*, at 59 ("[E]ven though [7 U.S.C. §16(e)(2)] is an express preemption provision, that alone does not end the preemption analysis of the CEA versus states sports betting."). My task is to look deeper.

Second, and to the partial contrary, the District of Nevada expressly considered the first savings clause of 7 U.S.C. §2(a)(1)(A). It concluded that the clause "does not give states regulatory authority over CFTC-designated exchanges because that language is limited by the phrase '[e]xcept as hereinabove provided.' [7 U.S.C. §2(a)(1)(A)'s] first sentence supersedes the SEC and state regulatory authorities' jurisdiction for contracts on a CFTC-designated exchange." *Hendrick*, 2025 WL 1073495, at *5. I agree with that construction. The second savings clause's reference to state courts'

10

jurisdiction says little about preemption of state regulation of designated contract markets. Of course state courts may retain jurisdiction over claims such as private fraud actions. *See* Kenneth B. Sills, 12A Tex. Jur. 3d Commodity Exchanges §8 (2025) ("In a private action for damages based on misrepresentation and deceptive trade practices in connection with futures contracts, the [CFTC] has neither exclusive nor primary jurisdiction with respect to such claims, and the jurisdiction of the [CFTC] is not exclusive of the jurisdiction of state courts to adjudicate such claims; thus, a claimant is not required to exhaust his or her administrative remedies prior to the commencement of suit."); Stacy L. Davis, John Kimpflen, J.D., & Karl Oakes, 7 Fed. Proc., L. Ed. §13:68 (2025) ("[T]he availability of the reparations forum at the CFTC does not bar state court jurisdiction of commodities fraud actions based on state law.")

As for the special rule for event contract's reference to state law, the District for the District of Columbia persuasively addressed this issue in an illustration last year. Addressing the CFTC's position that Kalshi's contracts concerning control of Congress involved unlawful activity because it is illegal in many states to stake money on an elections' outcome, the court noted that many states also define unlawful gambling as staking money on an contingent outcome. *KalshiEX LLC*, 2024 WL 4164694, at *12. Event contracts are, by definition, staking money on the outcome of a contingent event and under the CFTC's logic the special rule would apply to any event contract. *Id.* Thus the only workable interpretation of the special rule is that "unlawful under any Federal or State law" refers to the underlying event rather than the act of staking money on that event. *Id.* This logic is sound to me at this stage. Furthermore, even if "unlawful" refers to state gambling laws or "gaming" refers to the contracts at issue here, that would subject Kalshi to the review of the CFTC—not state regulators. *See Hendrick*, 2025 WL 1073495, at *6

11

("[E]ven if Kalshi's sports contracts involve 'gaming,' that would not subject Kalshi to state gaming laws. Rather, it would subject Kalshi to the special rule that allows the CFTC to conduct a public interest review.").

Finally, I am persuaded that Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction and am unconvinced by defendants' arguments to the contrary. Defendants argue that sporting events are without potential financial, economic, or commercial consequence. On the record before me, I disagree. *See* Aron & Jones, *supra*, at 79–80 (noting the use of similar language in defining a swap and event contract under the CEA and stating that sports bets may meet the requirement of a potential financial, commercial, or economic consequence). Kalshi references a few recent examples of the economic impact of sporting events in television, advertising, and local communities. (Kalshi Reply Br. pp. 8, 9.)

The special rule for event contracts states that no agreement, contract, or transaction determined by the CFTC to be contrary to the public interest may be made available on a registered market. *See* 7 U.S.C. § 7a–2(c)(5)(C)(ii). Therefore, at this stage, Kalshi's sports-related event contracts evidence—by their very existence—the CFTC's exercise of its discretion and implicit decision to permit them. *See* Vandenbergh, *et al.*, *supra*, at 1994 (noting that the CFTC has jurisdiction over event contracts and that the Dodd-Frank Act provided it with the authority to determine whether an event contract may be approved for trading via the special rule). "[T]o the extent that swaps, futures, or options are traded on [designated contract markets], state law would appear to be preempted by the CFTC's exclusive jurisdiction." Aron & Jones, *supra*, at 64.

Because I conclude that Kalshi has demonstrated a reasonable chance of prevailing—which in this case means proving that at the very least field preemption applies—I do not consider whether conflict preemption may also apply. I move on then to the irreparable harm prong.

### B.     **Irreparable Harm**

"[T]o show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 262 (3d Cir. 2020) (alteration in original) (quoting *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994)).  Such harm must be likely absent injunctive relief.  *Id.*

Kalshi submits that the Division's threatened enforcement is likely to cause it irreparable harm if its motion is not granted.  (Kalshi Mot. pp. 22–24.) If Kalshi does not comply with the Division, it faces credible threat of civil and criminal liability.  (*Id.* p. 22.)  One of Kalshi's partners has already chosen not to move forward with listing Kalshi event contracts in New Jersey due to a similar cease-and-desist letter it received from New Jersey authorities.  (ECF No. 2–1 (Sottile Decl.) p. 14.)  If it chooses to comply with the Division, Kalshi would forego business within New Jersey without the potential of recouping financial losses if it prevails.  (Kalshi Mot. p. 22.)  Kalshi does not currently have the need or means to geolocate users and doing so would cost Kalshi an estimated tens of millions of dollars annually, again with no guarantee of recoupment.  (*Id.* pp. 22, 23; Sottile Decl. pp. 6, 7.)  No matter what it does, Kalshi claims that it will face reputational harms associated with either being perceived as violating New Jersey law or ending its business in New Jersey and undermining user confidence.  (Kalshi Mot. pp. 23, 24.)

Defendants respond that potential liability does not constitute irreparable harm because Kalshi's claims may be raised as affirmative defenses.  (Defs.' Opp'n Br. p. 45.)  Further, economic injuries are insufficient and Kalshi can continue with all but a small portion of its sports-related event contracts so long as it obtains New Jersey licensure and complies with the Sports Wagering Act. (*Id.* pp. 45–47.)

Absent from defendants' argument is reference to Kalshi's asserted reputational harms. The loss of business and goodwill may constitute irreparable injury. *Marine Elec. Sys., Inc.*, 644 F. Supp. 3d at 95; *see also Guardian Life Ins. Co. of Am. v. Estate of Cerniglia*, 446 F. App'x 453, 456 (3d Cir. 2011) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will." (quoting *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 726 (3d Cir. 2004))). The declaration of Kalshi's head of markets states that the prospect of facing civil or criminal enforcement or complying and compromising the integrity of its contracts imperils the reputation Kalshi has cultivated over several years. (Sottile Decl. pp. 14, 15.) This is virtually the same "Hobson's choice" discussed in *Hendrick*. *See* 2025 WL 1073495, at *7. I am particularly persuaded by the representation that a similar cease-and-desist letter has already led one partner to decline to list Kalshi event contracts in New Jersey. (Sottile Decl. p. 14.) Therefore, I find that—at minimum—Kalshi has identified harms to its reputation and goodwill that are both likely without injunctive relief and not able to be remedied following trial.

### C. Balance of Interests

The parties' arguments as to the public and defendants' combined interests unsurprisingly boil down to their positions on the merits. Kalshi submits that because New Jersey law is preempted here, there is no public interest in enforcement. (Kalshi Mot. pp. 24, 25.) Defendants respond that states are harmed when they are enjoined from enforcing their laws and that New Jersey has an especially strong interest in regulating gambling. (Defs.' Opp'n Br. pp. 48, 49.) Revenues collected from gambling help support senior citizens and treatment for gambling addiction and a finding for Kalshi will encourage copycats to similarly evade state law. (*Id.* pp. 49, 50.)

Because I found above that Kalshi has established a likelihood of success in demonstrating that New Jersey law is preempted as applied to its sports-

related contracts, I also conclude that the interests favor injunction. "[T]he public interest [is] not served by the enforcement of an unconstitutional law." *N.J. Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 389 (3d Cir. 2012) (second alteration in original) (quoting *Am. Civ. Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)). Defendants' fear over copycats is also at least somewhat mitigated by the CEA's application process and related requirements. *See* 7 U.S.C. § 7(a); 17 C.F.R. § 38.3(a).

As far as any lost state revenue, such arguments are at least partially the product of the obvious tension between event contracts and sports wagering. Limited to Kalshi's alleged continuing violations of New Jersey law, Kalshi—as noted in *Hendrick*—proceeds at its own peril. *See* 2025 WL 1073495, at *8. Aside from any action the CFTC may take, a finding of likelihood of success on the merits here does not prejudge a finding for defendants through dispositive motion practice or trial. *See Bruni v. City of Pittsburgh*, 824 F.3d 353, 361 n.11 (3d Cir. 2016) (noting the "entirely different" standards governing motions for preliminary injunction and summary judgment). If defendants are proven correct, they may proceed with enforcement actions—thereby recouping at least some deprived revenues and vindicating any police power restrained by this decision in the process.

To find that the interests disfavor Kalshi—especially after determining that it has met its burden on the merits—would mean leaving it subject to state enforcement or obligating it to shift its business practices, consequences that are not cleanly undone. The balancing of the factors here caution me to keep the toothpaste in the tube. Kalshi's motion will therefore be granted.

### D. <u>Bond</u>

Finally, Kalshi argues that defendants will not suffer any nonspeculative harm by not proceeding with enforcement efforts against it and thus no security is necessary. (Kalshi Mot. p. 25.) Alternatively, if I determine that security

is needed, Kalshi asks that it be de minimis.  (*Id.*)  Defendants' opposition brief does not reference security.

Though I have discretion in setting the amount of bond, I do not find that my discretion extends to not setting one at all in this instance.  *See Marine Elec. Sys., Inc.*, 644 F. Supp. 3d at 96; *see also Tilden Recreational Vehicles, Inc. v. Belair*, 786 F. App'x 335, 343 (3d Cir. 2019) (noting that district courts must set bond even when the parties do not raise the issue and that waiver of the bond requirement applies to narrow circumstances in which compliance with the preliminary injunction poses no risk of monetary loss for the opponent).

The court in *Hendrick* determined that a de minimis security was warranted and set the bond at $10,000 with the parties having an opportunity to advocate for the sum to be increased or decreased.  2025 WL 1073495, at *8.  I find that that amount is in insufficient under the instant circumstances and instead determine that a bond of $100,000 is appropriate.  This sum is intended to mirror that of the maximum fine of a violation under the Sports Wagering Act.  *See* N.J. Stat. Ann. §5:12A–11(c).  If either party seeks an adjustment to this sum, they may do so by filing a letter of no more than three double-spaced pages on the docket.

### IV.  CONCLUSION

For the foregoing reasons, Kalshi's motion for a preliminary injunction will be GRANTED.  An appropriate order accompanies this opinion.

*/s/ Edward S. Kiel*
**EDWARD S. KIEL**
**UNITED STATES DISTRICT JUDGE**

Dated:  April 28, 2025